STATE of Tennessee, Appellee–
Respondent

v.

Edward JACKSON, Appellant–Applicant.

Supreme Court of Tennessee,
at Jackson.

Nov. 28, 1994.

W. Mark Ward, Memphis, for appellant.

Charles W. Burson, Atty. Gen. & Reporter and Rebecca L. Gundt, Asst. Atty. Gen., Nashville, for appellee.

*OPINION*

BIRCH, Justice.

On trial for first-degree murder in the Criminal Court for Shelby County, Edward

Jackson, the defendant, asserted an insanity defense. This defense was, however, rejected by the jury. Jackson was found guilty as charged and was sentenced to imprisonment for life. The Court of Criminal Appeals affirmed the conviction and sentence.[1]

We granted Jackson's application for permission to appeal to determine whether the proof adduced by the State sufficiently established that Jackson was sane beyond a reasonable doubt when the crime was committed. Because we find that the State failed in its obligation to establish Jackson's sanity beyond a reasonable doubt, we reverse the conviction, vacate the sentence, and remand the cause to the trial court for the initiation of proceedings pursuant to Tenn.Code Ann. § 33–7–303 (Supp.1994).

## I

The undisputed proof establishes that near the intersection of Third and Poplar in Memphis, Edward Jackson confronted Melvin Coffee and shot him twice. According to Sandra Elkins, M.D., Assistant Medical Examiner for Shelby County, one bullet entered the right side of Coffee's chest, lacerated his liver, went through his pancreas, and penetrated his left diaphragm. The other bullet entered high up on the right arm. It passed through the shoulder muscles into the chest cavity, went through the upper part of the right lung, and broke the fifth rib. In Elkins's opinion, these wounds produced massive injuries to Coffee's internal organs and caused his death.

Ample evidence of Jackson's mental condition and his relationship with Coffee was presented. This evidence established that Coffee had leased a small apartment in the basement of his home to Jackson. The two men became close friends. Also, Coffee permitted Jackson to help him in performing odd jobs around the neighborhood, and they usually divided the proceeds from these ventures.

The precise date is unclear, but in late 1989 or early 1990, Coffee evicted Jackson. Following this, Jackson began to talk irrationally about Coffee: for example, Jackson told others that Coffee had broken into his newly-acquired living quarters and poisoned his food. Beyond this, Jackson expressed the belief that Coffee was stalking him in order to kill him. These irrational beliefs produced irrational behavior. Perhaps the best illustration is the defendant's installation of a locking device on his refrigerator to keep Coffee out of it. In a related incident, Jackson was observed throwing away food he believed Coffee had poisoned. To escape Coffee's conduct as he perceived it, Jackson changed residences several times.

Homer Carter testified for the State. Carter had been Coffee's friend and long-time neighbor; he had visited with him daily. Carter also had known Jackson as Coffee's tenant in 1988 and a portion of 1989. Carter described the relationship between Coffee and Jackson as a "real close friendship." During the time Jackson was Coffee's tenant, Carter noticed nothing unusual about Jackson's behavior. On the other hand, Carter encountered Jackson a few months after his eviction. He testified that he had heard Jackson threaten to kill Coffee. This threat alarmed Carter, and he relayed it to Coffee the next day.

Edward Jackson testified in his own defense. Much of his testimony was unresponsive, exaggerated, or rambling. Nevertheless, he related to the jury that Coffee had broken into several of his residences and attempted to kill him by poisoning his food. For example, he testified that Coffee had "popped" his door lock one night, entered his living quarters, and sprayed a "strong, old" substance into his sink and on his television. Jackson mentioned that Coffee had hoodooed [2] him on several occasions. He testi-

---

1. *State v. Edward Jackson*, No. 02C01–9211–CR–00254, 1993 WL 369349 (Tenn.Crim.App. at Jackson, filed Sept. 22, 1993).

2. Hoodoo is an alteration of voodoo which is "a form of religious witchcraft prevalent among Blacks in the West Indies, especially Haiti, and the southern United States, and ultimately of African origin." The Oxford English Dictionary, vol. XIX, p. 762 (2d ed. 1989). To hoodoo is "to exercise occult influence over; to bewitch; to bring bad luck to." The Oxford English Dictionary, vol. XIX, p. 762 (2d ed. 1989).

fied that he had changed residences several times in order to "escape" from Coffee. These efforts, according to Jackson, were unsuccessful because Coffee had always managed to locate him anew.

Jackson related that he had intended to ambush Coffee. The plan failed, said Jackson, because he saw Coffee running away from the site of the intended ambush. He chased Coffee, but he claimed to have been unable to catch him. Jackson told also of his belief that Coffee had obtained insurance on Jackson's life—the clear import was that Coffee wanted to kill him to collect the proceeds.

Asked whether he "felt like it was wrong to shoot Mr. Coffee," Jackson replied:

No. What you done steady doing that to you. I couldn't—I'd have to go out somewhere and eat. Couldn't cook my food at home. Go to Britling's every evening. I'd catch the bus. I couldn't never cook nothing in my house. What would you'd done? I just went off. That's right. I just went off.

The question to Jackson, "do you think you're crazy," produced the following answer:

No, I know—I ain't crazy. I'm lucky I ain't crazy though. I don't bother people. Attend to my own business. I stay by myself. I didn't no [sic] he was—I never would've move there with that fellow if I had of knowed he was that way, because I had a nice place over there on Court. See, I move there because he had a truck. I liked to get out and scout around a little. Thought he was a real man. What he was trying to do, he done took that policy out on me and trying to kill me to get that money because the man—that life insurance. That man told me he done killed a lot of people over there; a man named Percy, P. Percy.

Samuel Craddock, Ph.D., a state-employed clinical psychologist, offered expert testimony in the defendant's behalf. He had exam-

ined and observed Jackson at the Middle Tennessee Mental Health Institute for approximately thirty days. Based on his examinations and observations, Craddock diagnosed Jackson as suffering from organic delusional disorder accompanied by mild brain damage. The delusion that had so completely gripped Jackson, Craddock testified, was that Coffee had been stalking him to kill him. He reiterated Jackson's belief that the assault on Coffee had been a rational and justifiable act.

With regard to intelligence, Craddock found Jackson to be "mildly retarded." He opined that Jackson's affect and responses were not those of one who wanted to be devious or deceptive. He observed nothing abnormal in Jackson's expressions or behavior except when asked about Coffee; apparently, all of his delusions related to Coffee.

After having demonstrated his understanding of the insanity standard as promulgated in *Graham v. State*,[3] Craddock stated, "It was both my personal opinion and that of the evaluation team members that Mr. Jackson's mental illness meets the *Graham* standard for an insanity defense." Craddock qualified this opinion, however, by restricting it to the first prong of *Graham:* that is, the inability to appreciate the wrongfulness of his conduct. Additionally, Craddock testified that Dr. Sneed,[4] a psychologist and colleague, concurred in the conclusion that Jackson met the *Graham* standard for the insanity defense.

Carol Irving, Jackson's sister, testified that Jackson was delusional when it came to Coffee; otherwise, he seemed to behave normally. She added that of the nine Jackson family members, five have been adjudicated "insane" and institutionalized. Another sister, Suse Jackson, corroborated her sister's testimony that Jackson was irrational regarding Coffee.

**3.** 547 S.W.2d 531, 543 (Tenn.1977). In *Graham v. State,* this Court adopted the American Law Institute definition of insanity. Under this standard, a person is insane and "not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.*

**4.** Dr. Sneed's full name does not appear in the record.

The State presented three rebuttal witnesses, two of whom were laypersons. The first, Charisse Mosby, Coffee's neighbor, had visited Coffee almost daily and saw Jackson often. She noticed nothing abnormal in his behavior. She admitted, however, that she last saw Jackson in 1988.

The second was Gertha Coffee, the victim's daughter. She had known Jackson for approximately ten years. Although she had lived in other cities for the better part of that time, she visited her parents frequently. The essence of her testimony was that she never noticed anything unusual in Jackson's behavior. Based on this, she opined that Jackson was sane.

The third witness was Lorne Allen Semrau, Ph.D., a clinical psychologist who practices privately. He examined Jackson at the request of the district attorney general and administered the Benton Visual Retention and the Minnesota Multiphasic Personality Inventory tests. Additionally, he read Craddock's report.

Semrau diagnosed Jackson as paranoid schizophrenic. He testified that only when Jackson's relationship with Coffee was involved did the paranoia and delusional thinking become apparent in his expressions and behavior. Thus, in Semrau's view, Jackson's mental condition permits him to present himself as "normal" under all circumstances except, as stated, those concerning Coffee.

Semrau elaborated on Jackson's illness in the following way:

Well, paranoia is a phenomenon where you develop tremendous fears of personal or bodily injury as a result of someone else's or some force's behavior. In other words, you become very, very fearful of—the most extreme case would be death. Normally, it would have to do with fear of loss, that I will be personally injured, bodily injured, or what is important to me will be taken away from me.

Schizophrenia is a condition where a person has either little or no contact with reality. In other words, they do not understand the consequences of their action or their behavior.

Let me say this to you. Schizophrenia is often thought as split personality. That is not correct. Multiple pesonality [sic] is a different phenomenon altogether. Schizophrenia has to do with marginal or little contact with reality, what is taking place within the environment.

Continuing, he responded as follows:

Q Doctor, if a person is delusional, will they be unable to function in what would ordinarily be normal activities, such as dressing one's self?

A No. Delusional systems can vary a great deal, obviously. Some are extremely encapsulated. In other words, where a person has only marginal contact in one small area, other people have multiple delusions. But just because a person has a specific delusion does not mean they can't be—can't think, act, dress themselves, bathe themselves, be responsible for their personal conduct.

Q Okay. And would that person necessarily seem odd to someone who was not dealing with that delusion?

A Well, the difficulty with delusions is that it has to do with a thought process, and if there is no external behavior that is associated with the delusion, other people will not know that it's taking place. So, for instance, I may be seeing pink elephants dancing across the back of the courtroom here today, and you would not know that I'm experiencing that phenomenon unless I told you or I went chasing after the pink elephants.

Additionally, Semrau testified that Jackson met the criteria for involuntary committal and will require long-term hospitalization and treatment.

## II

As stated, we granted the defendant's application for review in order to determine whether the evidence sufficiently established the defendant's sanity beyond a reasonable doubt.

In *State v. Smith,* this Court summarized the standard of appellate review of a jury verdict as follows:

A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. A verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, which the defendant has the burden of overcoming.

. . . .

When the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*State v. Smith,* 868 S.W.2d 561, 568–69 (Tenn.1993), *petition for cert. filed* (Apr. 4, 1994) (citations omitted). *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ Our focus here is on the insanity defense. Insanity is an absolute defense to a crime if "at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn.Code Ann. § 39–11–501(a) (1991); *Graham v. State,* 547 S.W.2d 531, 543–44 (Tenn.1977).

■ Although the law presumes sanity, *Brooks v. State,* 489 S.W.2d 70, 72 (Tenn. Crim.App.1972), if the evidence raises a reasonable doubt as to the defendant's sanity, the burden of proof falls upon the State to establish the defendant's sanity beyond a reasonable doubt. *Collins v. State,* 506 S.W.2d 179 (Tenn.Crim.App.1973); *Covey v. State,* 504 S.W.2d 387 (Tenn.Crim.App.1973). Sanity thus becomes an element of the crime. *State v. Clayton,* 656 S.W.2d 344, 346 (Tenn. 1983); *Stacy v. Love,* 679 F.2d 1209, 1213 (6th Cir.), *cert. denied* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982).

■ In order to prove sanity the State must prove either:

(1) the defendant was not "suffering from a mental illness at the time of the commission of the crime," or

(2) the illness proved did not "prevent his knowing the wrongfulness of his act" and did not "render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating."

*State v. Clayton,* 656 S.W.2d 344, 351 (Tenn. 1983). "Fail[ure] to present any evidence which addresses an essential element of the legal test of insanity [renders] a conviction . . . repugnant to due process and [the conviction] must be reversed." *Id.* at 352 (citing *Stacy v. Love,* 679 F.2d 1209).

■ In the case under submission, the proof establishes that the defendant was suffering from a mental illness at the time of the commission of the crime. Thus, in order to prevail, the State must prove the defendant was capable of appreciating the wrongfulness of his conduct and could conform his conduct to the requirements of the law. To assist the jury, the State may establish a defendant's sanity by the use of expert testimony, lay testimony, or by showing the defendant's behavior prior to, during, or after the commission of the crime was consistent with sanity and *inconsistent with insanity. Edwards v. State,* 540 S.W.2d 641, 646 (Tenn. 1976). The jury may consider both lay and expert testimony as evidence on this question, and it may discount expert testimony which it finds in conflict with the facts of the case. *Id.* at 647.

In this case there was both expert and lay opinion regarding the question of sanity. The first expert to testify was Craddock, a clinical psychologist with a doctorate in psychology and a member of the forensic team at Middle Tennessee Mental Health Institute, who examined the defendant approximately nine months after the crime, pursuant to court order. He based his opinion on five lengthy interviews with the defendant, a series of medical and psychological tests administered, and interviews with members of the defendant's family. Craddock concluded that the defendant suffered from a mental illness; the specific diagnosis was organic delusional

disorder. This mental illness rendered Jackson unable to appreciate the wrongfulness of his conduct because of his belief that he was "locked in a life or death struggle with Coffee, and that Coffee would have killed him had he not killed Coffee first." Craddock concluded that the defendant was not malingering; a psychiatrist and other staff members who had observed the defendant while in the hospital reached the same conclusion.

The other expert was Semrau, who examined the defendant nineteen months after the crime. Semrau concluded that the defendant suffered from paranoid schizophrenia, a mental illness. He suggested that the defendant was malingering, yet he concluded that the defendant was mentally ill enough to be committed and that an insanity defense was supportable. He based this opinion on a three hour interview with the defendant and on two psychological tests administered to the defendant.

■ Despite differing as to precise diagnosis, both experts agreed that the defendant suffered from severe mental illness and that an insanity defense was supportable. Their conclusions were based not only on interviews with the defendant but also on recognized psychological tests. Further, Semrau stated that the testimony of Mosby and G. Coffee to the effect that the defendant seemed normal when they saw him was not inconsistent with a delusional disorder. Finally, the defendant's mental illness as described by the expert witnesses was consistent with the defendant's actions and demeanor before and after the commission of the crime.

The lay witnesses, Mosby and G. Coffee, testified that in their limited experience with the defendant he:

1. lived alone and was able to care for himself;
2. borrowed money and food;
3. had a good memory;
4. made appropriate responses to questions; and
5. appeared normal.

■ As stated above, in order for the State to meet its burden of proving sanity, it must provide "evidence which is consistent with sanity and inconsistent with insanity." *Edwards v. State,* 540 S.W.2d at 647.

According to Semrau, the State's expert, the lay testimony offered by the State was not inconsistent with the behavior typically associated with the defendant's particular mental illness. This would be true, said Semrau, under either diagnosis—paranoid schizophrenia as he concluded, or organic delusional disorder as found by Craddock.

Thus, the State's evidence, though *consistent* with sanity, does not establish sanity because it is not *inconsistent* with insanity.

In conclusion, we find that the State has failed as a matter of law to prove that the defendant while suffering from a mental illness was capable of appreciating the wrongfulness of his conduct and conforming his conduct to the requirements of law. As a consequence of this evidentiary failure, the evidence was not sufficient to warrant any rational finder of fact to find the existence of each of the elements of first-degree murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Accordingly, we reverse the conviction and vacate the sentence. We remand the cause for entry of a judgment of "not guilty by reason of insanity" and the initiation of proceedings under Tenn.Code Ann. § 33–7–303 (Supp.1994).

ANDERSON, C.J., DROWOTA and REID, JJ., and O'BRIEN, Special Justice, concur.