IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
MARCH SESSION, 1996

FILED

February 19, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | No. 01C01-9508-CC-00270 |
| Appellee | ) | |
| | ) | RUTHERFORD COUNTY |
| vs. | ) | |
| | ) | Hon. J. S. Daniel, Judge |
| LAURA ANN HUDSON, | ) | |
| | ) | (Direct Appeal-First Degree Murder) |
| Appellant | ) | |

For the Appellant:

**Gerald L. Melton**
District Public Defender
201 West Main Street, Suite 101
Murfreesboro, TN  37130

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**William David Bridgers**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

**Bill Whitsell**
District Attorney General
Rutherford County Judicial Bldg.
Murfreesboro, TN  37130

OPINION FILED: _____

REVERSED AND REMANDED

**David G. Hayes**
Judge

**OPINION**

The appellant, Laura Ann Hudson, was convicted by a Rutherford County jury of the first degree murder of her infant nephew and of arson to personal property. Following the jury's verdict, the appellant filed a motion for judgment of acquittal and a motion for new trial. After taking the matter under advisement, the trial court denied her motion for judgment of acquittal, but granted her motion for new trial on the basis that the State failed to carry its burden of proof on the issue of insanity. In this appeal, the appellant contends that the trial court erred in denying her motion for judgment of acquittal. We hold that a new trial is not the appropriate remedy when the trial court finds that the State did not meet its burden of proof; therefore, the trial court erred in granting a new trial. Moreover, because we find that the State of Tennessee failed to present sufficient evidence to support the jury's finding that the appellant was not insane, the appellant's convictions for first degree murder and setting fire to personal property are vacated and dismissed. This cause is remanded to the trial court for entry of a judgment of "not guilty by reason of insanity" and the initiation of proceedings under Tenn. Code Ann. § 33-7-303.

**Background**

On December 29, 1991, the appellant took her one month old nephew, William Randall Youngblood, into a Buddhist Temple in Murfreesboro, and while cradling the baby in her arms, shot and killed him.[1] Because the appellant was holding the baby at the time, she also wounded herself. The appellant then attempted to set her vehicle on fire while she and the baby were inside. When police officers arrived at the scene, the appellant was found lying on the ground beside her vehicle, clutching the child in her arms. The appellant's Bible was found

---

[1]The infant sustained two near gunshot wounds to the posterior of his left chest.

2

nearby, opened to the Book of Psalms, Twenty-third Chapter. In the front of the Bible, the following inscription was handwritten: "I, Laura, will die, but hope will live for always for her father. I love my heavenly father and my brother for always, and I hope will love heaven always. Hope will live always for our God almighty." When an officer approached, she confessed to the shooting, claiming, "God told me to."

Several days after the incident, the appellant gave the police a different version of events. The appellant claimed that an anonymous caller had telephoned her and asked if she could bring some gas to the Buddhist Temple. When she arrived at the temple, the person shot her and the baby. However, when the police challenged this story, she once again admitted shooting the child and stated that the child was the son of Satan. One officer testified at trial that the appellant "stated that God told her in 1990 that the Devil's baby would be born and that she was to kill it." The appellant also told officers that God gave her the baby in 1990, and she gave the baby to her sister, who subsequently delivered him. The appellant added that God had instructed her to bring the gasoline to "burn the Temple down" and to "battle the Devil." She explained her actions by the statement, "when God tells you to do something you do it."

The appellant's sister, Polly Youngblood, and her boyfriend, William Beeman, were the parents of the young victim. Youngblood testified that she and her sister had a close relationship, in which there was no animosity. When Youngblood became pregnant with William, the appellant appeared very excited. The appellant helped care for her sister when Youngblood began having problems with her pregnancy and was present in the delivery room when William was born. The proof revealed, on cross-examination, that the appellant was actually of little help to her pregnant sister, as the appellant slept on the couch all day long, while Youngblood was forced to carry in firewood. Youngblood testified that the appellant was "crazy" about William and mothered the child as if he were her own.

On the Friday prior to the shooting, the appellant left her home in Kentucky and arrived at her sister's home for a visit. Both Youngblood and Beeman testified that they noticed nothing unusual about the appellant, except that she repeatedly offered to pay Youngblood and Beeman to spend the night at a hotel while she stayed with the children. Youngblood and Beeman declined.

The next day, the appellant expressed an interest in buying from her sister a small pistol to give as a gift to her husband. Youngblood and Beeman agreed to sell her the gun for $150, even though the gun's value was much less. That night, the appellant purchased ammunition for the gun at K-Mart. The gun was used to shoot her nephew the following day.

At the time of the incident, the appellant had recently undergone a hysterectomy, and her children had moved away. The appellant had previously suggested to her sister that she and her husband adopt William. The appellant had also offered Beeman money or a motorcycle to leave Youngblood so that she could live with her sister and the baby.

Both Youngblood and Beeman testified that the appellant had become increasingly religious before the offenses occurred. However, neither regarded the appellant's religious behavior as particularly unusual or odd. They testified that the appellant appeared normal during her visit, with the exception that she was depressed. In fact, Youngblood, on one occasion, telephoned the appellant's husband in Kentucky suggesting that the appellant seek psychiatric counseling.

Both Youngblood and Beeman were astonished to learn that the appellant had killed their child. When Youngblood confronted her sister after the shooting, the appellant denied any involvement and claimed that someone else had shot her and

4

William. Youngblood testified that her sister has never expressed any remorse over her actions.

The appellant's husband, Joe Hudson, testified on behalf of the defense at trial. He stated that the appellant had become very depressed in the three months preceding the shooting, He testified that she slept during the day and stayed awake at night. She also seemed disinterested in their marriage and was away from home often. He also noted that, although the appellant was typically a religious person, her interest in religion grew more intense in the months prior to the shooting. Indeed, Hudson testified that, a few months prior to the shooting, the appellant stated that she was God's favorite angel and believed that she could see the future. She also believed that she had a "face-to-face" conversation with God. After the incident, Hudson noticed crosses and crucifixes hanging in all of the windows of their home. Hudson further testified that he did not believe that his wife knew the difference between right and wrong nor that she knew what she was doing at the time she shot the child.

Several of the appellant's friends also testified for the defense. Patricia Neighbors, a close friend of the appellant, stated that the appellant had become withdrawn in the months preceding the shooting. Amanda Embry and her older sister, Crystal, were also friends of the appellant. Amanda testified that the appellant appeared normal just days prior to the incident, but noted that the appellant advised her to avoid the Devil. Crystal, on the other hand, testified that the appellant's behavior was unusual in the days preceding the incident. She remembered the appellant saying that she could feel her sister's contractions when she was pregnant with William. Crystal also recalled an incident where the appellant brought china, jewelry and other items to Crystal's home and broke them over a garbage can. Further, the appellant asked Crystal if she would give her soul to fight the Devil if God so asked her. Amanda and Crystal's mother, Elizabeth

Embry, testified that the appellant told her on two separate occasions that she was being tormented by the Devil.

Three expert witnesses were called to testify regarding the appellant's sanity at the time of the incident. All three experts testified that the appellant was insane when the crimes were committed. All three agreed that the appellant was suffering from the diagnosed mental illnesses of delusional disorder and depression. Dr. Samuel Craddock, a clinical psychologist, evaluated the appellant during her month-long stay at the Middle Tennessee Mental Health Institution (MTMHI) beginning in October of 1992. Dr. Craddock opined that, at the time that he met with her, the appellant was mildly depressed; however, she was not out of touch with reality as the result of this depression. According to Craddock, the appellant was suffering from delusional disorder at the time of the incident. Specifically, the appellant was experiencing delusions that God directed her to kill her nephew. Craddock believed that the appellant's bizarre, deviant thinking had existed for a considerable period of time prior to the shooting.

Dr. Craddock testified that the appellant failed to appreciate the wrongfulness of her actions as a result of the delusional disorder. However, Dr. Craddock was of the opinion that the appellant could conform her conduct to the requirements of the law.

On cross-examination, the State's questions and Craddock's responses revealed that Craddock had been misinformed by various family members and friends giving background information on the appellant. Craddock acknowledged that, if his evaluation were based on inaccurate information, his conclusion might have been erroneous. He recognized that the appellant's mother, as a psychiatric technician in the Veteran's Hospital, would be familiar with characteristics which would create an insanity defense. He further agreed that there were many

6

inconsistencies in the appellant's behavior, an example of which being the appellant's loving and nurturing relationship with the child she claimed to be the child of the Devil. Additionally, he testified that the appellant was able to premeditate and deliberate, and the evidence indicated that the appellant had planned the murder.

Dr. Gillian Blair, a clinical psychologist, met with the appellant on three separate occasions in April and May of 1992. She testified that the appellant appeared emotionless and depressed and suffered from major depressive disorder with psychotic features. Dr. Blair opined that, in the circumstances of William's death, the appellant was unable to conform her conduct to the requirements of the law. However, she stated that the appellant could appreciate the wrongfulness of killing someone "in the abstract."

When confronted with the disparity in her opinion and that of Dr. Craddock, Blair testified that the appellant's ability to appreciate the wrongfulness of her actions and to conform her conduct to the requirements of the law "kind of become intertwined in that . . . her appreciation of what was right and what was wrong was influenced by her delusional system and the command that she believed she had from God." However, she acknowledged that, in her opinion, the appellant could appreciate that it was wrong to kill someone. Furthermore, she was surprised to learn that Dr. Craddock believed that the appellant had the ability to conform her conduct to the requirements of the law.

On cross-examination, Dr. Blair testified that she only interviewed the appellant and the appellant's father for background information. Although Dr. Blair testified that the appellant was withdrawn and introverted with distant and "conflictual" family relationships, she was unaware that friends and family considered the appellant to be friendly and outgoing with close family ties.

7

Furthermore, in making her assessment of the appellant's mental condition, Dr. Blair did not consider that the appellant was considered "bossy" and "social" in her interactions with other patients at MTMHI. Additionally, Dr. Blair thought it was possible that the appellant, as a dependent personality, would have feelings of resentment toward those close to her, including her sister.

Dr. Ahmad Farooque, a staff psychiatrist at MTMHI, was the third expert called by the defense. Dr. Farooque evaluated the appellant as part of a team with Dr. Craddock. During her stay at MTMHI, Dr. Farooque saw the appellant seven or eight times. He concluded that the appellant suffered from a delusional disorder. He further opined that, as a result of this disorder, the appellant could not appreciate the wrongfulness of her conduct and could not conform her conduct to the requirements of the law.

Dr. Farooque admitted on cross-examination that his report failed to express his opinion that the appellant could not conform her conduct to the requirements of the law. Although his report contained the opinion that the appellant failed to appreciate the wrongfulness of her conduct only, Dr. Farooque insisted that he had furnished a complete report to the court. When questioned as to why he failed to include in his report that the appellant was unable to conform her conduct to the requirements of the law, Dr. Farooque responded that he did not have time to communicate this fact in his opinion.

The State offered no proof in rebuttal.

At the conclusion of the proof, the jury rejected the insanity defense and returned guilty verdicts for one count of premeditated first degree murder and one count of setting fire to personal property.

8

Following the jury's verdict, the appellant filed a motion for judgment of acquittal alleging that the State failed to carry its burden of proof on the question of the appellant's insanity.  The appellant simultaneously moved for a new trial.  Although these motions were heard in July 1993, the trial court held them under advisement until April 24, 1995.  In the interim, the Tennessee Supreme Court decided the cases of State v. Jackson, 890 S.W.2d 436 (Tenn. 1994) and State v. Sparks, 891 S.W.2d 607 (Tenn. 1995).  Both cases bear on the nature of the proof required to rebut the defense of insanity.  Although these cases do not alter the well-settled principle that the State may rebut a claim of legal insanity solely through lay testimony, the opinions hold that such lay testimony "must be consistent with sanity and inconsistent with insanity."  Sparks, 891 S.W.2d at 616.

On April 24, 1995, the trial court denied the motion for judgment of acquittal, but granted the appellant a new trial.  The trial court concluded that :

> [Jackson and Sparks] alter[] the capacity of the State to meet its burden when utilizing exclusively lay testimony.  It appears from these most recent decisions that when expert testimony supports the defense of insanity, that lay opinion of witnesses must be supported by adequate foundation and the evidence offered by the lay witness must be consistent with sanity and not [sic] inconsistent with insanity.  This standard renders it almost impossible for the State to succeed without the assistance of an expert when the mental disease or defect of paranoid schizophrenia is advanced because such persons often demonstrate conduct or action that would appear to be consistent with sanity when they are in effect not inconsistent with insanity as viewed by the professional experts in the field.

At the hearing on the motion, the trial court stated that the State lacked proof "to carry out [its] burden of proof on the issue of sanity."  In its order, the trial court concluded that it must grant a new trial since "this new standard was not addressed by the State in the trial of this matter or met."

The appellant now brings this appeal from the denial of the motion for judgment of acquittal and the grant of a new trial in lieu thereof.

**Procedural Error**

Although the trial court determined that the State had not carried its burden on the issue of sanity, it denied the appellant's motion for judgment of acquittal. However, the trial court granted the appellant's motion for a new trial "to afford the State an opportunity to prove the issue of sanity under the standards now enunciated by the Tennessee Supreme Court" in Jackson and Sparks. Due to the trial court's ruling, this court deems it necessary to further clarify the distinction between sufficiency of the evidence and the weight of the evidence.

In Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211 (1982), the United States Supreme Court discussed the distinction between evidentiary weight and evidentiary sufficiency. The Court stated:

> a conviction rests upon insufficient evidence when, after viewing the evidence in the light most favorable to the prosecution, no rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reversal based on the weight of the evidence, on the other hand, draws the appellate court into questions of credibility. The "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."

457 U.S. at 37-38, 102 S.Ct. at 2216. A finding of legal insufficiency "means that the government's case was so lacking that it should not have even been submitted to the jury." Burks v. United States, 437 U.S. 1, 16, 98 S.Ct. 2141, 2150 (1978) (emphasis in original). However,

> [ a]n inquiry into the weight of the evidence is entirely different. The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence. As the Eighth Circuit stated in United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980), even if the trial judge concludes that "Despite the abstract sufficiency of the evidence to sustain the verdict, [that] the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [he] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. at 1319.

State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting) (emphasis in original).

Under principles of double jeopardy, the State is precluded from retrying a defendant where the trial court found insufficient evidence to sustain the conviction and entered a judgment of acquittal. Burks v. United States, 437 U.S. at 18, 98 S.Ct. at 2150-51. However, if the trial court finds that the weight of the evidence falls in favor of the defendant, he or she may be retried without violating double jeopardy. Tibbs v. Florida, 457 U.S. at 44, 102 S.Ct. at 2219.

When a trial court determines that the evidence is legally insufficient to sustain a conviction, the court "shall order the entry of judgment of acquittal." Tenn. R. Crim. P. 29(a). However, if the trial court merely "disagrees with the jury about the weight of the evidence," the court is permitted to grant a new trial on that basis. Tenn. R. Crim. P. 33(f). From this court's review of the record, it is clear that the trial court found that the State failed to carry its burden of proof on the issue of sanity and, therefore, determined that the evidence was legally insufficient to sustain the appellant's conviction. Thus, the trial court erred in granting a new trial. It is now the duty of this court to review the evidence to ascertain whether the evidence is, indeed, insufficient to support a finding of sanity beyond a reasonable doubt.[2]

---

[2]The trial court determined that Jackson and Sparks changed the State's burden of proof on the issue of insanity. The trial court expressed its belief that holding the State to this additional burden would be inherently unfair in that this trial concluded prior to the release of Jackson and Sparks. Therefore, the trial court granted a new trial. If, in fact, these cases altered the State's burden of proof on the issue of insanity, and thereby created a new constitutional rule, that rule should have been applied retroactively to this case. "[N]ewly announced state constitutional rules will be given retroactive application to cases which are still in the trial or appellate process at the time such rules are announced, unless some compelling reason exists for not so doing." Meadows v. State, 849 S.W.2d 748, 754 (Tenn. 1993). Jackson and Sparks do not modify the State's burden of proof on this issue, and the doctrine of retroactivity would, therefore, not apply. Infra.

**Insanity**

The question before this court is whether the State sufficiently established, beyond a reasonable doubt, that the appellant was legally sane at the time the offenses were committed. Insanity at the time an offense is committed is an absolute defense to a crime. Indeed, "[i]nsanity is a defense to prosecution if, at the time of such conduct, as a result of mental disease or defect, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law." Tenn. Code Ann. § 39-11-501(a)(1991) (amended 1995); Graham v. State, 547 S.W.2d 531, 543-544 (Tenn. 1977). It is clear from the statutory language that proof of either the "wrongfulness" prong or the "volitional" prong resulting from a mental disease or defect is sufficient to support an insanity defense. Id.

The sanity of the accused is presumed. State v. Overbay, 874 S.W.2d 645, 650 (Tenn. Crim. App. 1993); Brooks v. State, 489 S.W.2d 70, 72 (Tenn. Crim. App. 1972). Thus, the accused bears the initial burden of proof. If the evidence raises a reasonable doubt as to the sanity of the defendant, the State assumes the burden of proving the defendant's sanity beyond a reasonable doubt. State v. Sparks, 891 S.W.2d 607, 615 (Tenn. 1995). Once the burden has shifted to the State, sanity becomes an essential element of the crime. Sparks, 891 S.W.2d at 616 (citations omitted). There is no dispute that the appellant made an adequate prima facie showing of insanity. Therefore, we proceed directly to the sufficiency of the State's proof.

Again, in order to prove sanity, the State must prove either :

(1) the defendant was not suffering from a mental illness at the time of the offense; or

(2) the illness did not prevent the defendant from knowing the wrongfulness of his act and did not render the defendant substantially incapable of conforming his conduct to the requirements of the law.

12

State v. Peevyhouse, No. 01C01-9409-CC-00307 (Tenn. Crim. App. at Nashville, Mar. 22, 1996), perm. to appeal dismissed, (Tenn. Sept. 9, 1996) (citing Jackson, 890 S.W.2d at 440; Graham, 547 S.W.2d at 544).  The State may show the sanity of the defendant "through the use of expert testimony, lay testimony, or by showing that the defendant's behavior prior to, during, or after the commission of the crime was consistent with sanity and inconsistent with insanity."  Sparks, 891 S.W.2d at 616;  Peevyhouse, No. 01C01-9409-CC-00307 (citing Edwards v. State, 540 S.W.2d 641, 646 (Tenn. 1976), cert. denied, 492 U.S. 1061, 97 S.Ct. 784 (1977)).  Thus, "the jury is allowed to consider both lay and expert testimony as evidence, and it may discount expert testimony which it finds to be in conflict with the facts of the case."  Sparks, 891 S.W.2d at 616; see also Jackson, 890 S.W.2d at 440.

Again, the appellant's proof consisted of three mental health experts and numerous lay witnesses.  All three mental health experts testified that the appellant was legally insane.  Even though two of the experts disagreed as to which prong of the legal insanity test applied to the appellant, Dr. Blair noted that, the nature of the appellant's mental illness, *i.e.*, that God was directing her to perform certain acts, would confuse the two prongs of appreciating the wrongfulness of her act and conforming her conduct.  See, e.g., Jackson, 890 S.W.2d at 441.  Additionally, lay witnesses presented by the defense related numerous incidents of the appellant's abnormal behavior.

The State presented no evidence to rebut the defense proof regarding insanity.  Rather, the State relied upon its cross-examination of the expert witnesses, which although tactically effective from a juror's perspective, failed to cause the experts to retreat from their initial diagnoses.  The State also relied upon the testimony of lay witnesses presented in their case-in-chief. However, the testimony of the State's lay witnesses is also supportive of the appellant's bizarre behavior, *e.g.*, act of laying a crucifix on her pregnant sister's stomach  confirming

13

that the child was the son of Satan, the appellant's conversation with the Devil at a bar, her staying up all night to color and sleeping throughout the day, her fascination with becoming the queen of a motorcycle club and her face-to-face conversation with God.

Regardless of this bizarre behavior, lay testimony of a defendant's normal behavior, in and of itself, is insufficient to rebut the testimony of expert witnesses when the mental illness or defect involved is of such a nature that the appellant would behave normally and would not exhibit any signs of mental illness unless specifically questioned as to that defect. See Sparks, 891 S.W.2d at 617; Jackson, 890 S.W.2d at 441. In the present case, for example, for a lay witness to perceive the appellant's mental illness, that witness would have to specifically question the appellant as to whether she spoke with God. Neither Beeman nor Youngblood ever questioned the appellant regarding her relationship with God. Thus, although the State's proof was, to a large extent, consistent with sanity, we cannot conclude that it was entirely inconsistent with insanity.

We conclude that the State has failed to prove that the appellant was capable of appreciating the wrongfulness of her conduct and conforming her conduct to the requirements of the law. As a consequence, the evidence was not sufficient to warrant any rational finder of fact to find the existence of each of the elements of first degree murder beyond a reasonable doubt. Accordingly, the conviction entered by the jury is reversed and vacated. This cause is remanded for entry of a judgment of "not guilty by reason of insanity" and the initiation of proceedings under Tenn. Code Ann. § 33-7-303.

_____
DAVID G. HAYES, Judge


CONCUR:


_____
JERRY L. SMITH, Judge


_____
WILLIAM S. RUSSELL, Special Judge