IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 2, 2001

## STATE OF TENNESSEE v. LUIS ANTHONY RAMON

**Direct Appeal from the Circuit Court for Henry County**
**No. 12937      Julian P. Guinn, Judge**

_____

**No. W2001-00389-CCA-R3-CD - Filed August 9, 2002**

_____

The Henry County Grand Jury indicted the fifteen-year-old Defendant for first degree murder. The Defendant was tried as an adult and convicted of the charged offense. The trial court sentenced the Defendant to life imprisonment. The Defendant now appeals, arguing that his insanity defense was established by clear and convincing evidence. After a thorough review of the record, we reverse the judgment of conviction, modify the judgment to "Not Guilty by Reason of Insanity," and remand for further proceedings pursuant to Tennessee Code Annotated § 33-7-303.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Modified to "Not Guilty by Reason of Insanity"; Remanded.**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., joined. JOSEPH M. TIPTON, J., filed a dissenting opinion.

W. Jeffery Fagan, Assistant District Public Defender, Camden, Tennessee, for the Appellant, Luis Anthony Ramon.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

The Henry County Grand Jury indicted the Defendant, Luis Anthony Ramon, for first degree murder for the stabbing death of his aunt. The Defendant was tried as an adult and convicted of the charged offense. The trial court sentenced the Defendant to life imprisonment. The Defendant now appeals, arguing that insufficient evidence was presented at trial to convict him of first degree murder. Specifically, the Defendant argues that he should have been found not guilty by reason of insanity because the proof was clear and convincing that he was insane when he stabbed his aunt. We agree.

## I. FACTS

Richard Allen Levesque testified that on March 11, 1999, he was employed as a 911 dispatcher with the Paris Police Department. Levesque stated that at approximately 2:50 p.m. on that date, he answered a 911 call from 195 Hill Road in Henry County. According to Levesque, a male subject on the line stated that he had just killed his aunt. The subject identified himself as Luis Anthony Ramon. Levesque testified that a tape was made of his initial conversation with the Defendant, as well as his subsequent conversation with the Henry County Sheriff's dispatcher. The tape was entered into evidence as an exhibit and played for the jury. The following content was heard in open court:

> Dispatcher: 911, what is your emergency?
> Caller: I just stabbed my aunt.
> Dispatcher: Pardon me?
> Caller: I just stabbed my aunt. She is bleeding.
> Dispatcher: You just stabbed her?
> Caller: Yes, I did.
> Dispatcher: Okay, what is your name?
> Caller: Luis Anthony Ramon.
> Dispatcher: Luis Anthony Ramon?
> Caller: Yes.
> Dispatcher: Okay, I'll need to transfer you to the sheriff's office. But first, do you feel any pulse?
> Caller: I think she died, because there's blood all over the place.
> Dispatcher: Okay, go check and come back to me, okay?
> Caller: Yes.
> (Another dialing heard and sheriff's office answering.)
> Dispatcher: This gentleman is going to be coming back on the line, Luis Ramon, and I'm not sure what his last name is. He said he just stabbed and killed his . . .
> (Caller heard coming back on line.)
> Dispatcher: Okay, what is your last name again, Luis?
> Caller: Ramon.
> Dispatcher: Ramon. Okay, I'm going to dispatch an ambulance to the 195 Hill Road.
> Caller: Yes.
> Dispatcher: Okay, the sheriff's office is on the line now.
> Caller: Alright.
> Dispatcher: Go ahead and tell them.
> Sheriff's office: Yes, sir.
> Caller: I just killed my aunt, I think. I stabbed her with a butcher knife.
> Sheriff's office: Okay.
> Caller: What?
> Dispatcher: She's talking to the officers now. We're getting an ambulance underway too.
> Caller: Can you tell me how to stop her bleeding?

-2-

Dispatcher: Where is she bleeding from?
Caller: (No response.)
Sheriff's office: Sir?
Dispatcher: I was going to tell him how to control the bleeding.
Sheriff's office: Okay, where did he stab her at?
Dispatcher: That's what I'm trying to find out. He stabbed her with a butcher knife. He thinks she's dead.
Sheriff's office: Do what?
Dispatcher: He said he thought she was dead, but she's bleeding all over.
Sheriff's office: Send ambulance to 195 Hill Road.

William Gary Vandiver, an investigator with the Henry County Sheriff's Office, testified that he investigated the stabbing death of the victim. According to Vandiver, he arrived on the scene at approximately 2:50 p.m. on March 11, 1999. Vandiver gave the following testimony regarding his arrival at the crime scene:

I responded to the scene after hearing the radio dispatcher, from my office. I arrived on the scene just seconds behind the patrol officer. The patrol officer was going inside the residence, being a double-wide mobile home. As I entered the front door, only a second or two behind, Sergeant Rod Frey and Deputy Terry Tyler, I heard Deputy Tyler speaking, and the subject identified as Luis Anthony Ramon. Mr. Ramon was dressed in a brown coverall. The coveralls had blood on them. He was wearing boots. As I walked in, I heard Mr. Ramon indicating to Deputy Tyler, "She's over by the washer." And, within a second or so, with Sergeant Frey, he said, "I found her." Sergeant Frey directed me back to a utility room, which is the washer and dryer, utility room of the trailer, which leads right to the rear door. I found, there I found the body of [the victim], lying on the left side in a fetal position, from the washer and dryer. She appeared to have been stabbed more than once, from what I observed at that time. Large amount of blood on the floor, ah, blood splatters up the three or four feet on the wall, and a large amount of blood up and around her, on her and the washer and dryer. Also, lying on the dryer was a blade, eight-inch blade from a butcher knife, lying inside a handle. The handle had been broken from the knife.

After I made these initial observations, the emergency personnel went in to make sure the victim was deceased. I went out and advised Deputy Tyler to take [the Defendant] from the trailer. I went out and asked [the Defendant], then, who he was. He responded and gave me his name. I asked him how old he was, which he told me he was 15. I asked him who his mother was, and he gave me the name of Donna Ramon. I asked him where his mother was. At this time he told me, "She's at my grandmother's funeral in Smyrna." At this time I took photos of [the Defendant] and collected from him, ah, took coveralls and boots from him at this time as evidence. And [the Defendant] was transported to the Henry County Sheriff's Department.

On further investigation on the scene, I found, in the counter and kitchen area, a white hockey mask; also found a bloody boot print on the living room floor. Ah, correction, on the kitchen floor, leading from the living room.

Vandiver also identified a photograph of the house where the victim was found and testified that the home was the residence of the Defendant and his mother, Donna Ramon. Vandiver stated that a hockey mask was found near the telephone and that there were "blood smudges" on the telephone.

Vandiver testified that through his investigation of this case and after talking to different people, he determined that the Defendant had been acting as if he was Michael Myers[1] for "six months or so." Vandiver stated that "according to the family members, . . . [the Defendant] would be wearing his coveralls or a rain, poncho rain suit. He would stand out in the front yard wearing it, and around the residence, wearing . . . the attire, and at times, the hockey mask." Vandiver further testified that in many of the "Jason movies,"[2] the character, Jason, is standing out in the rain and looking in the residence. Vandiver testified that family members informed him that [the Defendant] would "be standing close to the residence, around the window, at night, wearing a hockey mask. Sometimes he'd be holding a flashlight under the hockey mask." Vandiver testified that he spoke to Pat Atchinson from the Henry County School System regarding the Defendant. Vandiver recalled that Atchinson stated that the Defendant had been hearing voices. Vandiver also testified that the victim lived with her father in a place located about one hundred feet behind the Defendant's residence.

Dr. Cynthia Gardner, a forensic pathologist at the University of Tennessee at Memphis, conducted an autopsy on the victim and determined that the cause of death was multiple knife stab wounds. According to Gardner, the victim sustained a 3.2-inch-deep stab wound in the right chest, a 5.4-inch-deep stab wound in the left armpit penetrating two chambers of the heart and the liver, and a 7.1-inch-deep stab wound in the right shoulder penetrating a lung and the liver. Gardner also noted a bruise and a linear abrasion on the victim's forehead, a linear-incised wound below the victim's nose, a linear-incised wound on the right thumb, and a bruise on the right eyebrow. Gardner testified that the linear wounds were defensive wounds. Gardner estimated that the victim would have lived only minutes after receiving the stab wounds.

The trial court ordered the Defendant's admission to Western Mental Health Institution to determine his competency to stand trial, his state of mind at the time of the crime, and his commitability. Dr. Ann Quinn Phyfer, a psychologist at the Western Mental Health Institution, testified for the defense. Dr. Phyfer testified that she met the Defendant when he was admitted to the institution on March 11 or 12, 1999. Phyfer stated that the first time she met with the Defendant, she was a member of a treatment team which included a psychiatrist, a psychologist, a registered nurse, a social worker and an activity therapist. As the result of the evaluation, the Defendant was diagnosed with catatonic schizophrenia, which Phyfer stated refers to "some kind of

---

[1]Michael Myers is a fictional character first appearing in the horror movie *Halloween*.

[2]Jason is a fictional character in a series of horror movies entitled *Friday the 13th*.

bizarre movement." She explained that this frequently means that a person will assume a bizarre posture and maintain it or that they will move around in a "senseless way." Phyfer stated, "The essential component of being catatonic is to have purposeless movement," and she reported that in the Defendant's case, he would become immobile.

Phyfer testified that the Defendant was later diagnosed with paranoid schizophrenia. Phyfer explained that schizophrenia is "characterized by a positive and negative symptom. Positive symptoms are hallucinations and/or delusions." According to Phyfer, the Defendant suffered from delusions which Phyfer defined as "beliefs that have no basis in reality, but which are nevertheless held rigidly by the person." Phyfer also stated that persons suffering from delusions "respond to the delusional false belief and don't have any contact, or much contact, with reality." Phyfer specified that the Defendant suffered from paranoid delusions that "there was a group of people who were going to kill him, and he was powerless against this group of people." Phyfer further testified that the Defendant "thought that he was going to be killed unless he could somehow protect himself."

Phyfer elaborated on the Defendant's delusions as follows:
> He came to the conclusion, and this is apparently over a long time, because he had delusions about killing other people that date back in the records to 1997. But, and he watched the movie *Halloween* some 30 times. He came to believe that if he could become the character of Jason, or Michael Myers, and wear a mask and carry a knife, that he could himself become a murderer. And if he could become that murderer, he could protect himself against this group. And that was the only way that he could protect himself. And when he wore the mask, and I believe the overalls - that he put on the symbols that represented to him the ability to protect himself and become as bad as his persecutors. That he would become a murderer in order to protect himself, and that was the only way he could see that he could protect himself. He was, back in '97, having the thoughts that he would - this is according to the medical record, he had thoughts of killing two teachers and a principal. And he stated that he'd also kill whoever else came into the bathroom at school. He planned to carry a knife, because he felt he couldn't conceal a gun. But he had that planned. He also planned to kill his mother and her boyfriend. So, this was not just an idea that popped into his head on March the 11th, I think, of 1999. It was something he had had for a long while, earlier than that.

Phyfer also testified that as far back as 1997, it was documented in the Defendant's medical record that he used to set fires without purpose and act excessively cruel to animals, two "hallmarks of childhood that herald the onset of schizophrenia." Phyfer testified that the Defendant said that he would set fires and kill animals "just for the fun of it." Phyfer testified that schizophrenia is a spectrum disorder and that the Defendant's illness was "as severe as [she had] ever seen."

Phyfer was questioned regarding the Defendant's apparent lack of emotion when he made the 911 call, and she responded that schizophrenics often have "deficit symptoms." Phyfer explained that a person with schizophrenia may have a "lack of intensity, a lack of emotional response, that we consider normal." Phyfer testified that where others would "presumably respond by being

emotionally happy or sad or fearful, [the Defendant] would not. He would be emotionally flat." Phyfer stated that when the Defendant killed the victim, he was not able to appreciate right from wrong. According to Phyfer, the Defendant "was not in touch with reality and right and wrong." Phyfer testified that there is "no possibility as far as [she] could foresee, that [the Defendant] would ever be able to function outside of a highly structured, secure, inpatient facility." Phyfer stated that the Defendant had been admitted to the Western Mental Health Institution on five occasions, most recently on February 3, 2000. Phyfer testified that the Defendant was also admitted to Baptist Hospital in Union City in 1998.

Dr. David R. Richie, a psychologist at Western Mental Health Institute, testified that he conducted a forensic examination on the Defendant on March 31, 1999 and submitted a Certificate of Need for Judicial Hospitalization. Richie testified that the Defendant had a severe psychotic disorder, as evidenced by his delusions that he was a movie character who commits serial murders. Richie testified that the Defendant suffered from a flatness of effect or lack of emotion and that he was very reclusive. Richie testified that the Defendant would exhibit and maintain unusual postures such as sitting all day in a "crunched position" staring at the floor. According to Richie, the Defendant complained of hearing voices, such as the voice of the devil, and he stated that on at least one occasion, the Defendant reported he had a visual hallucination. Richie testified that the treatment team determined by a unanimous decision that the Defendant suffered from catatonic and paranoid schizophrenia.

Richie testified that the Defendant had delusions that someone was "out to get him, out to murder him." Richie stated that the Defendant reported having those delusions at age 14. Richie recalled that once, after the Defendant began taking medicine, the Defendant said, "Whatever I'm afraid of, I won't be afraid of anymore if I become what I'm afraid of." Richie believed that in the Defendant's mind, he became the character in the movie *Halloween*. According to Richie, the Defendant did not appreciate the wrongfulness of his acts on March 11, 1999.

Randy Dale Stone, the victim's brother and the Defendant's uncle, testified he lived in the same neighborhood as the Defendant. Stone testified that he saw the victim on a daily basis. Stone believed that the Defendant should be placed in a hospital.

## II. ANALYSIS

The Defendant argues that insufficient evidence was presented at trial to convict him of first degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant argues that he should have been found not guilty by reason of insanity. The current insanity statute provides:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Tenn. Code Ann. § 39-11-501(a); see also State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (stating that the burden of proof is on the defendant to prove insanity by clear and convincing evidence). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hodges v. S. C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992). "In determining the defendant's mental status at the time of the alleged crime, the trier of fact may look to the evidence of his actions and words before, at, and immediately after the commission of the offense." Holder, 15 S.W.3d at 912. The trier of fact may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994).

In denying the Defendant's motion for a new trial, the trial court made the following findings:

> The [D]efendant presented two expert witnesses in support of [the insanity] defense: Dr. Ann Quinn Phyfer, a forensic psychologist, and Dr. David R. Richie, a forensic examiner with a specialty in psychology. They established that the [D]efendant was grossly or severely psychotic, was afflicted with catatonic and paranoid schizophrenia and suffered from delusions. These witnesses were of the firm opinion that absent a miracle drug the defendant would never be able to function outside of a highly structured, secure, inpatient facility. The [S]tate produced no evidence of sanity or elicited such evidence from these witnesses on cross examination. The [D]efendant did not testify.

The trial court further noted that it "is a gross understatement to say this case has not troubled the court." The trial court stated that "this [D]efendant should be incarcerated in a mental institution and afforded whatever treatment is available now or in the future and not simply housed in a penitentiary."

After a thorough review of the record, we conclude that the Defendant proved by clear and convincing evidence that he was insane at the time of the offense. The record is virtually void of any evidence that the Defendant was sane at the time of the stabbing. It is undisputed that the Defendant was hospitalized for mental illness on several occasions before his arrest in this case. Furthermore, two qualified mental health professionals gave uncontroverted and unimpeached testimony indicating that the Defendant was unable to appreciate the wrongfulness of his acts at the time of the crime as a result of a severe mental disease or defect. Our review reveals neither sufficient lay testimony nor sufficient expert testimony concerning the Defendant's mental state at or near that time of the stabbing that would justify rejection of the insanity defense. Because we conclude that a rational trier of fact could only find that the Defendant, at the time of the stabbing, was unable to appreciate the wrongfulness of his act as a result of a severe mental disease, we find that the defense of insanity was established by clear and convincing evidence. See State v. Flake, No. W2000-01131-CCA-MR3-CD, 2001 Tenn. Crim. App. LEXIS 517, at *16 (Tenn. Crim. App., Jackson, July 13, 2001). In reaching our conclusion, we are mindful that all factual issues and the weight to be given evidence are within the purview of the trier of fact. See Buggs, 995 S.W.2d at 105; Matthews, 805 S.W.2d at 779; Liakas, 256 S.W.2d at 859. However, because we conclude, after viewing the evidence in a light most favorable to the State, that a rational trier of fact could only find that insanity has been established by clear and convincing evidence, we may not sustain a guilty verdict. See generally Tenn. R. App. P. 13(e); Jackson, 443 U.S. at 319.

Accordingly, we REVERSE the judgment of the trial court, MODIFY the judgment to "Not Guilty by Reason of Insanity," and REMAND the case to the trial court for further proceedings pursuant to Tennessee Code Annotated § 33-7-303.

_____
ROBERT W. WEDEMEYER, JUDGE