On the afternoon of May 5, 1981, William M. Clark walked into the barber shop owned by Ransom Hullett. Mumbling words that could not be understood, he drew two pistols from his coat pocket and shot Mr. Hullett twice, hitting him in the arm and side. Clark was indicted and convicted for attempted murder and sentenced to twenty years' imprisonment. On appeal, as at trial, the major issue is whether the *Page 658 
evidence of insanity was so overwhelming and uncontradicted that it rebutted the presumption of sanity and warranted a directed judgment of acquittal. Our review convinces us that the great preponderance of the evidence sustained the plea of insanity and overcame the State's presumption of sanity.
Mr. Hullett testified he had been cutting Clark's hair about once a month for the past eight months. Clark was never hostile, "didn't bother nobody," and was polite and courteous. He paid his bill and left a tip but Mr. Hullett did not have any conversation with him.
At the time of the shooting, Clark pushed the door open, mumbling something that was not understood, walked toward Mr. Hullett and fired, then walked out of the shop, threw the pistols in his car and drove off. As a rebuttal witness, Mr. Hullett testified that Clark was sane and "just looked normal" on the day of the shooting.
Aaron Vester was visiting Mr. Hullett in the barber shop when the shooting occurred. He testified that Clark "walked in the shop with two guns in his hands and he was mumbling something." Clark walked toward Mr. Hullett, fired twice, turned and walked out. Clark "didn't look like he was satisfied." Mr. Vester testified that Clark was always "nice" to him but "never did have too much to say." He stated that Clark "didn't act strange, but he just didn't talk much."
Birmingham Police Officer John Self went to the scene of the shooting and received a description of the assailant and the car he was driving. He stopped Clark and arrested him as Clark was getting out of his car near an apartment complex. Officer Self found a pistol in each of Clark's two pockets. The .380 automatic "had three rounds in the magazine and one hung in the chamber where it looked as though it had jammed. The RG .38 had two spent cartridges in it and four live rounds in it."
After Clark had been handcuffed, he voluntarily and spontaneously told Officer Self
 "that he shot, taken care of the barber, and he didn't call his name, he just said he's taken care of him and he would have taken care of the woman, too, if she had been there. They had been messing with him while he was getting a haircut and he went back to settle things."
Self informed Clark of his constitutional rights. He obtained general information such as Clark's name, address, date of birth, and that he was the owner of the car and the pistols. With his testimony the State rested.
Jean Bonner Miller testified she was Clark's legal guardian and that it was her responsibility to receive his check from the Veterans' Administration and deposit it for him, although she was not responsible for what he did with his monthly allowance. Prior to 1969, Mrs. Miller's husband had been Clark's legal guardian. Although it had been ten years since she had seen him, she testified that Clark had written her three or four years before and told her that he had died on Highway 69 and he wanted her to pay his insurance.
Dr. Edward Benson, a psychiatrist, testified that he examined Clark for one hour on June 14, 1982, and concluded that Clark was a paranoid schizophrenic chronic type. Dr. Benson testified that Clark was "obviously psychotic" and that he "was not responsible for his actions in that he did not realize he was doing a criminal act." Dr. Benson stated:
 "I asked why he had done this, at the time I was sure he was a paranoid schizophrenic individual anyway, and I asked him why he had done this and he said he felt the barber and the barber's brother had damaged him sexually. He had gone to that barber for many years and he felt he had made him impotent, that is unable to function sexually, getting an erection, by pouring liquid soap into a psychiatric incision in his upper back. He said this killed my nature and I couldn't cut right, which meant that he could not get an erection or penetrate his sexual partner. He believed it interfered with his memory so that he didn't remember that this *Page 659 
had even occurred. He believed that the barber was trying to change him into a homosexual probably so that he could have Mr. Clark as his sexual partner. He said he learned all of this when the barber had supposedly told a girlfriend that he was going with what he had done to me. All of this scared Mr. Clark and made him so angry that he went back and shot the barber. He said he wanted to kill him and he didn't think what he had done was wrong because of the severe injury that this man had caused him. And it was my impression that he had been obviously psychotic at the time and this was part of a psychotic delusional system and he was acting out against the individual who had done it to him."
Dr. Benson testified that "Clark is liable to be stuck with this problem indefinitely" and that the chances were "definite" that he would attack someone again. He stated that Clark's symptoms were so "cut and dried" that any other psychiatrist would agree with his diagnosis.
Dr. Benson stated that Clark's medical records from the Naval Hospital in Oakland, California, and the V.A. Hospital in Tuskegee, Alabama, indicated that Clark had been diagnosed as a schizophrenia reaction paranoid type since 1956. The records also revealed that Clark was 100% disabled due to this service connected mental condition.
After Clark had been sentenced, the trial judge ruled, "the Defendant having extensive mental illness history, it is ordered by the Court that the Defendant be diagnosed mentally to determine if said Defendant should be incarcerated in Taylor Hardin Mental Health Facility."
The State argues that the facts that Clark directed his action only against Mr. Hullett, that Clark did not act strange, and that Clark was able to answer the police officer's questions constitute "ample facts from which the jury could have drawn an inference that the defendant was sane." This contention must be rejected as unsound on authority of Ex parteTurner, 455 So.2d 910 (Ala. 1984). See also Alvis v. State,434 So.2d 859 (Ala.Cr.App. 1983).
Here, as in Alvis, 434 So.2d at 864, Clark's actions were so bizarre, unprovoked, and without a rational basis that there was no evidence from which the jury could reasonably infer that he was sane when the shooting occurred.
Our review of the record compels the same conclusion reached in Ex parte Turner, 455 So.2d at 913:
 "After consideration of all the testimony presented at trial, we conclude the evidence of the defendant's insanity was so strong and overwhelming that it mandated the jury find appellant was insane at the time the crime was committed. For all that appears from the record, we can find no facts which would give rise to a reasonable inference to sustain the jury's conclusion that appellant's act was that of a sane man; hence the conviction could only prevail because of the rebuttable statutory presumption of sanity. Because we consider that appellant has conclusively overcome this presumption of sanity by the great preponderance of the evidence, the jury's decision cannot stand."
The judgment of the circuit court is reversed and this cause is remanded so that that court may determine whether or not Clark should be involuntarily committed to the Alabama State Department of Mental Health or released as authorized by Alabama Code 1975, Section 15-16-41, et seq.
REVERSED AND REMANDED.
All Judges concur. *Page 660