STATE

v.

David BARRETT.

No. 97–286–C.A.

Supreme Court of Rhode Island.

April 6, 2001.

Lauren Sandler Zurier, Aaron L. Weisman, Providence, for Plaintiff.

Lauren E. Jones, Providence, for Defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

On July 18, 1995, David Barrett shot and killed Joseph Silvia. He was later indicted, tried by a Superior Court jury, and convicted of second-degree murder, and of carrying firearms without a license. In this appeal, he challenges his conviction for second-degree murder, contending that at the time that he shot Silvia he was of such diminished mental capacity as to be incapable of having formed the required intent and premeditation necessary for conviction. He also contends that the trial justice, during his trial, erred in barring his defense counsel from questioning various lay witnesses about his mental state and in denying his motions for judgment of acquittal and for a new trial. For the reasons hereinafter set out, we deny his appeal and affirm the Superior Court's final judgment of convictions.

## I

### Case Facts and Travel

The shooting concerned in this case took place on July 18, 1995, in the parking area at McCabe's Mobil gasoline station on the Wampanoag Trail in East Providence. On July 14, 1995, several days before the day of the shooting, David Barrett [1] (defendant or Barrett) had gone to the convenience store section at the Mobil station intending to meet there with Michael Glynn (Glynn), who was employed as a clerk and station attendant. He wanted Glynn to meet a friend, Idrees Richardson (Richardson), who was with Barrett at the time. When Barrett entered the convenience store with Richardson, Glynn was preoccupied and seated behind a service counter. When Barrett attempted to introduce Richardson to Glynn, Glynn remained seated, ignoring Barrett. Obviously annoyed, Barrett took a piece of pizza from a counter display and threw it toward Glynn. Glynn threw it back at Barrett. Barrett then ran behind the counter to where Glynn was working, and Glynn pushed him back. Barrett then threatened Glynn, telling Glynn he would "kill" him "six times to Tuesday." [2]

Several days later, on the night of July 17, 1995, Barrett, Richardson, and Brian Dinsmore (Dinsmore), after having smoked some marijuana, drove to the New York System restaurant in the Olneyville Square section of Providence in Barrett's Saab automobile. At that time, Barrett, who often carried firearms, had two with him, and he carried both with him into the restaurant. He said he did so because he feared that it would not be safe to leave them in the vehicle, where "somebody might steal them" because of the "rough" character of the neighborhood.

Barrett and his two friends left the restaurant shortly before midnight, and Barrett decided to drive to McCabe's Mobil station in East Providence, some ten or more miles distant from Olneyville Square, to "check" out Glynn and to see how he was "conducting himself" because he was "pissed off" at Glynn. Barrett and his two friends arrived at the Mobil station between 12:15 a.m. and 12:45 a.m. Barrett parked his vehicle at one of the gasoline pumps and remained parked there with his friends, seated inside, for a "long time," with the car's high-beam headlights facing directly into the convenience-store section of the station, where Glynn was standing. After a few moments, Glynn came out of

---

1. David Barrett, a medical doctor in the field of psychiatry, is sometimes referred to in the opinion as Dr. Barrett.

2. The "pizza-throwing" incident, as well as Barrett's actions that afternoon in the convenience store, were recorded by the store's security surveillance cameras and shown to the jury during Barrett's trial.

the store, walked over to Barrett's car and apologized to Barrett for the earlier pizza-throwing incident between them. Barrett angrily responded in a loud voice and told Glynn to "get away from the car." Glynn did, and went back into the convenience store. Barrett and his friends remained in the vehicle, still parked at one of the gasoline pumps.

A short time later, while Barrett's vehicle remained parked at the gasoline pump, a friend of Glynn's, Joseph Silvia, whom Glynn had known since their junior high school days, drove into the gasoline station. He went in to see Glynn and, while there, apparently inquired of Glynn about any "problem" Glynn might have been encountering from the "guys in the Saab" parked at the gas pump. Some ten to fifteen minutes later, Silvia left Glynn, entered his van and drove alongside Barrett's parked car. As the van approached Barrett's car, Barrett said to Richardson and Dinsmore, "[n]o guns." Silvia asked Barrett, "[w]hat's up brother? Can I help you with anything?". Barrett sarcastically replied that "I'm not your brother" and "[j]ust leave me alone." Silvia then told Barrett "[l]isten, if you're bothering my friend I will kill your ass." At this point, Barrett, according to his friend Richardson, began arguing with Silvia and got out of his vehicle to "escalate" at Silvia. Silvia quickly moved his van forward, fencing in Barrett between the car's open door and the side of Barrett's car. Silvia then drove his van forward a little, at least three times, and finally backed away from Bar-

rett's car. Barrett then quickly reached into his car, took one of his guns that was loaded, and gave the other gun to Richardson, who also exited the car. Richardson got out of the car and stood on the cement island where the gasoline pumps were located. Dinsmore remained in the car. Barrett pointed his gun at Silvia, and said, "[l]ook, I have a gun." Upon seeing Barrett's gun, Silvia drove away and began slowly circling in the small station parking area. Silvia eventually drove out of the station parking area, but then immediately returned and proceeded this time to drive slowly in a "herky-jerky" manner, moving both forward and in reverse, until he came up to and made contact with Barrett's car. Barrett, still with gun in hand, then pointed it at Silvia, and began "chasing [Silvia] around the parking lot," and telling Silvia at least thirty times to leave or he would shoot him.[3]

Silvia, obviously irked by Barrett's threat to shoot him, drove his van directly in front of Barrett's parked vehicle, where he then backed the van and slammed into the front of Barrett's vehicle. At this point, Barrett walked up to the van, reached into the open driver's side window and shot Silvia in the left cheek, just below the eye, at point blank range. He then fired a second shot into Silvia. Barrett then calmly backed away from the van, looked around to see if anyone had observed what he had done, and then returned to the van, reached in, saw Silvia slumped over on the front seat, and fired a

---

**3.** In Barrett's appellate brief, he alleges that Glynn testified that it "looked like [Silvia] was taunting the little guy" (Barrett). The trial record reads somewhat differently. In cross-examining Glynn about a statement Glynn had made to the police shortly after the shooting incident, defense counsel asked:

Q. In that statement it says, doesn't it, 'Joey didn't leave the lot. He looked like he was taunting the little guy as if to say what are you going to do with that thing?' That is what it says, doesn't it?

"A. I think that sounds right.

"Q. Isn't that why you never called the police, because you knew it was Joey taunting the little guy?

"A. Excuse me?

"Q. That is why you never called the police. The whole time you saw Dr. Barrett with the gun you never once called the police because you knew it was Joseph Silvia taunting David Barrett, didn't you?

"A. No. Mr. Barrett, your client, followed Mr. Silvia with a gun. It wasn't that other way around. There was no van chasing David Barrett. It was David Barrett following the van. Don't get that mixed up, please."

third shot directly into Silvia's body. Dinsmore then got out of the car and asked Barrett if he had killed Silvia. Barrett looked in the van at Silvia's body and responded, "I f- - - -' killed him. * * * Yeah, man the guy is gone."

Barrett, after firing the last round into Silvia's body and fearing that Glynn had seen him shoot Silvia, then hurried to the front window of the convenience store, where he opened his gun, took the remaining rounds out of the gun and placed the gun and the bullets on the window sill. Barrett later explained that he did that because he was afraid that Glynn might have had a gun in the convenience store and that he was afraid that Glynn would shoot him. He also shouted at Glynn, "[t]hat is your fault. Look what you did. * * * Now you have to live with this on your mind." Barrett then told Richardson to go into the convenience store and have Glynn call the police, and Barrett returned to his vehicle. He told Richardson that he did not want to go into the store because he was afraid "Glynn would probably freak out" if he did. Barrett then put his gun on the dashboard of his car because, as he later explained, he wanted the police to see the gun there when they arrived, and that "I don't get shot by the police." Barrett then also decided to remove his outer shirt so that the police would not think that he might be carrying a concealed weapon. He also took out of his shirt pocket a bag of marijuana and told Dinsmore to "[g]et rid of this" because he "[d]idn't want to be caught with that." He later explained that he did not want the police to think that the shooting was his fault because of the marijuana. Then, because he saw smoke coming from his car, Barrett told Dinsmore to turn off the car's engine. Within minutes, the East Providence police arrived at the Mobil station, briefly questioned Barrett, saw Silvia's dead body, and then placed Barrett, Dinsmore and Richardson in a police car. Barrett later, at the police station, after being advised of his Miranda rights, gave a detailed written statement to the police in which he admitted shooting Silvia. In his appeal, Barrett challenges his conviction for second-degree murder, contending that at the time that he shot Silvia, he was of such diminished mental capacity as to be incapable of having formed the required intent and premeditation necessary for conviction of murder. He also contends that the trial justice, during his trial, erred in barring his defense counsel from eliciting opinions from various lay witnesses about his mental state, and that later he erred in denying his motions for judgment of acquittal and for a new trial.

We take up Barrett's appellate contentions in the order of their presentation.

Other facts that may be pertinent to our discussion of Barrett's appellate contentions will be supplied as needed.

## II

### Diminished Capacity

At his Superior Court trial, it was generally conceded that Barrett had a long history of bipolar disorder. Whether at the time he shot and killed Silvia that mental defect had prevented Barrett from being able to appreciate the wrongfulness of shooting Silvia, or from conforming his conduct to the requirements of the law, was both questioned and disputed.

Bipolar disorder, also called manic depression, is a mental illness characterized by episodes of both depression and a highly elevated mood. Other symptoms of the disease may include paranoia, intense agitation and energy, and aggressiveness. The severity of the disease differs individually but generally falls along a spectrum, ranging from highly symptomatic and highly impaired (manic) to less impaired and less symptomatic (hypomanic).

In *State v. Johnson*, 121 R.I. 254, 399 A.2d 469 (1979), we adopted the Model Penal Code standard for determining a person's ability to form the intent necessary for criminal culpability. We said in that case that:

"A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible.

The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." *Id.* at 267, 399 A.2d at 476.

We found great merit in the Model Penal Code test because it recognized that in the determination of a defendant's alleged insanity or diminished capacity, that issue was delegated to a fact-finder or trial jury and is essentially a legal rather than a medical question, which permits a trial jury or fact-finder to consider volitional as well as cognitive impairments in determining a defendant's responsibility. *See, e.g.,* Annotation, *Mental or Emotional Condition as Diminishing Responsibility for Crime,* 22 A.L.R.3d 1228, 1238–40 (1968 & 2000 Supp.). The Court in *Johnson* was particularly influenced by the Model Penal Code's recognition that in lieu of our then prevailing *M'Naghten* Rule, the Model Code permitted "a reasonable three-way dialogue between the law-trained judges and lawyers, the medical trained experts and the jury." *Johnson,* 121 R.I. at 266, 399 A.2d at 476. In Barrett's trial in the Superior Court, that three-way dialogue was played out.

At Barrett's trial, the severity of his bipolar disorder was vigorously contested. Both the state's prosecutor and defense counsel proffered and relied upon the medical opinion testimony of well-qualified experts, who offered opposing opinions concerning the extent and severity of Barrett's diminished capacity at the time of the shooting.[4]

Two of those expert witnesses, Dr. Thomas Paolino and Dr. Thomas Gutheil, testified as defense witnesses for Barrett. Doctor Paolino, a board certified psychiatrist, who interviewed Barrett on nine separate occasions before Barrett's trial, testified that at the time of the shooting Barrett suffered from bipolar disorder in the manic phase, with psychotic and paranoid characteristics. When questioned on direct examination concerning whether or not as a result of this mental disease the defendant Barrett was able to appreciate the wrongfulness of his conduct at the time of the shooting, Dr. Paolino testified:

"My opinion is that David Barrett was convinced that Joseph Silvia was going to kill or severely injure him or his friends. It's my opinion that he didn't think it was wrong to shoot him, because he didn't know of any alternatives because as a result of his psychosis. In essence, the psychosis which includes the paranoid delusions, mania, and grandiosity denied him any alternatives. In the psychotic mind he was—either shoot or his friends and then he would be either killed or severely injured. If he were not psychotic or paranoid he wouldn't even be carrying a gun in the first place. Basically, paranoia, mania, and the delusions, grandiosity essentially left him no options or alternatives then to [*sic* ] what he did."

Doctor Paolino ruled out that Barrett's anger played any role in the shooting, and concluded that Barrett, at the time of the shooting, was not capable of conforming his conduct to the requirements of the law. However, during his direct examination, Dr. Paolino had earlier testified that Barrett's mental condition, "like any mental disorder it can be compensated, or can be decompensated, could be he has got a disorder impaired by it, or he has got a disorder but it's under control." He further explained that the terms compensated

4. Rule 704 of the Rhode Island Rules of Evidence permits "[t]estimony in the form of an opinion otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

and decompensated meant that "[o]ne means disorder is so bad he couldn't do this job in this case, and the other is that he has got a disorder, or at least in the history of the disorder it's not interfering with his job or his life."

On cross-examination, however, Dr. Paolino conceded that moments after the shooting Barrett was aware of what he had done, knew right from wrong, and was then able to conform his conduct to the law as evidenced by Barrett's decision to discard and conceal from the public the marijuana that he had in his vehicle. Doctor Paolino disputed, however, that this meant that Barrett was legally sane or of full mental capacity when moments earlier he had shot Silvia. In essence, Dr. Paolino testified that Barrett could have had a "manic" attack as a result of his altercation with Silvia that led to the shooting, and then Barrett could have become non-manic moments after the altercation ended.

Doctor Gutheil, also a board certified psychiatrist, testified for Barrett. Although he interviewed Barrett on only one occasion, he relied mostly for his diagnosis on the extensive reports of Dr. Paolino. He opined, as did Dr. Paolino, that Barrett was suffering from bipolar disorder at the time of the shooting. He testified that Barrett's ability to conform his behavior at that time to the requirements of the law and to appreciate the wrongfulness of actions was "substantially impaired" when he shot and killed Silvia. He concluded that Barrett was "very frightened, convinced he was going to die, and feeling endangered throughout that entire block of time as events escalated." Doctor Gutheil, unlike Dr. Paolino, however, questioned whether Barrett's decision, following the shooting, to discard and conceal the marijuana·to avoid its detection, and his culpability, indicated that Barrett was then able to conform his conduct to the law. He explained:

> "In looking at a situation where a person's mental state is at issue three giveaways that the person doesn't meet the criteria for insanity, classically hiding of crime, the hiding of evidence, and hiding of one's self. * * * In relation to marijuana, did exactly that, he hid the evidence. You—realization of shooting, exact opposite. Decided to wait, urged other people that wanted to leave to stay. He laid out his identifying cards. I mean, exact opposite of trying to conceal your identity. He puts the gun, bullets in various places in the car, and so forth. And, basically, puts everything—the exact opposite of concealment—literally on display."

Under cross-examination, Dr. Gutheil, however, unlike Dr. Paolino, conceded that on the day of the shooting, Barrett exhibited only symptoms of hypomania, a milder form of bipolar disorder. Whereas Dr. Paolino had testified that on the day of the shooting, Barrett could not be hypomanic by definition, Dr. Guthiel testified that Barrett, on that day, was hypomanic. He also conceded that he could not rule out that anger—not just paranoia—played a role in Barrett's decision to track down, shoot and kill Silvia.

Following his arrest and questioning at the East Providence police station, Barrett was taken to the Adult Correctional Institutions and was there interviewed by Dr. Martin Bauermeister, a psychiatrist in charge of psychiatric services for the Department of Corrections. He testified that when he attempted to speak with Barrett, Barrett told him that he had been advised by his lawyer not to talk to the doctor. Doctor Bauermeister noted in his medical record that Barrett seemed rational, made rational statements and that he "noticed no evidence of psychotic misinterpretation of reality." When asked by defense counsel if it was "possible for someone who is psychotic to be calm a period of time," the doctor replied, "[y]es. Not all crazy people are crazy all the time."

Doctor Robert Cserr (Dr. Cserr), a practicing board certified psychiatrist, was called as a prosecution witness. Doctor Cserr, based on one interview he had with

Barrett and based on his review of Barrett's extensive medical record, acknowledged that Barrett had a long history of mental illness. Doctor Cserr opined, from his review of Barrett's medical history, that Barrett had become "increasingly grandiose" in the weeks before the shooting, and that his bipolar disorder was in a manic to "hypomanic/manic" stage on the morning of the killing. He also acknowledged that Barrett's mental illness played some role in the shooting. "I think without the mental illness he probably wouldn't have gone to the station, or remained there, or when confronted [by Silvia] might have left. So, there is some degree of impairing his judgment * * *."

However, Dr. Cserr said that Barrett was not legally insane at the time when he shot and killed Silvia, and that Barrett at that time was able to understand the wrongfulness of his actions and, as well, his need to conform his behavior to the requirements of the law. He explained that, just prior to the shooting, Barrett, along with Dinsmore and Richardson, went:

> "to eat at one of the New York Delis, something, in Olneyville, that David—Dr. Barrett has the presence of mind to take the guns in his car in with him because it's not safe to leave them in the car. Don't really see that as someone who is seriously, or severely manic, out of control. There seems to be a significant element of awareness, cognitive ability of risk there. Then drive around, end up at a gas station * * *. Was that on the basis of if he is paranoid about somebody why is he going there? I mean, that doesn't make sense to me. Really paranoid about a situation you guard yourself. You don't put yourself in that situation."

Doctor Cserr rejected the suggestion that Barrett believed that he could not drive away from the Mobil station as a result of mental illness. He also interpreted Barrett's tracking down and threatening Silvia, before he shot Silvia, and then Barrett's unloading of the gun in front of Glynn, as indicative of "some degree of composure" and "what the risk might be" if Glynn, Sylvia's friend, did have a weapon and that he might use that weapon to avenge Sylvia's being shot. Doctor Cserr also found that Barrett's discarding of the marijuana to conceal it from the police was evidence not only of his sanity, but also of his then presence of mind and ability to think on how to avoid detection, positing that "it's hard to say that you don't know about something major [the shooting] and yet you're totally tuned into something relatively minor that can get you into trouble." He challenged defense counsel's suggestion that it would be possible for Barrett to be psychotic at the time of the killing and not be psychotic just moments later at the time of his deciding to dispose of the marijuana. Doctor Cserr steadfastly maintained that, despite some mental impairment, Barrett was not of such diminished capacity at the time of the shooting as to preclude his ability to appreciate the wrongfulness of what he was doing or to conform his conduct to that required of him by the law. He reasoned:

> "Well, because of the irritability, because of the grandiosity, because of the difficulty testing reality there was some impairment in Dr. Barrett's ability to handle all of this information, and to control. But, was it so substantial that it interfered with his ability to know that it was wrong and to conform his behavior? I would maintain no. * * *
>
> So, there is some degree of impairing of his judgment, some degree of his making really good decisions. But, basically, despite that he seemed to know—on the basis of the information that I reviewed—that what he was doing was wrong, and that he could have controlled it."

In short, Dr. Cserr appears to have agreed with the observation made by Dr. Bauermeister that "not all crazy people are crazy all the time." Thus, the trial jury had before it for its consideration, the various expert opinions from the medical witnesses. The mere fact that two of

those opinions supported Barrett's diminished capacity defense as opposed to only one supporting the state's position that Barrett was capable of forming the requisite mental intent necessary for conviction of murder is not in itself dispositive of the issue of Barrett's mental condition at the time of the shooting. Trial jurors are uniformly reminded that in their evaluation of expert witness opinion trial testimony they should not decide disputed issues of fact solely upon the number of the witnesses testifying for or against a particular fact issue, but instead, upon the quality of the evidence concerning that fact issue. In this case it is perfectly obvious that the trial jurors opted to accept the opinion testimony offered by Dr. Cserr and to reject in great part the opinion testimony proffered by Drs. Paolino and Guthiel. That was the trial jury's choice to make.

 We, of course, recognize from the trial record that there was evidence of Barrett's sometimes bizarre behavior and nonconformist actions indicative of his long-standing psychological infirmity. That evidence alone, however, did not, as Barrett now contends, require a conclusion by the trial jury that Barrett lacked the required mental capacity to have been able at the time he threatened, tracked and shot Silvia, to conform his conduct to the requirements of the law. "The fact that a defendant engaged in unusual behavior or made bizarre or delusional statements does not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane." *People v. Gilmore*, 273 Ill.App.3d 996, 210 Ill.Dec. 471, 653 N.E.2d 58, 61 (1995); *see also People v. Fierer*, 260 Ill.App.3d 136, 197 Ill.Dec. 755, 631 N.E.2d 1214 (1994).[5] We discern in the trial record more than sufficient evidence to support the jury's finding that, beyond a reasonable doubt,

Barrett had the substantial and necessary mental capacity to conform his conduct to the requirements of the law at the time he went to the Mobil station on July 18, 1995, and when he tracked down, shot and killed Silvia.

"We concede that, by necessity, * * * the diminished capacity standard, like the insanity defense, place great burdens on the trier of fact. Unlike the 'reasonable man' standard in negligence law which asks the factfinder to compare a defendant's behavior with the usual or proper societal behavior, these ask the factfinder to look into the psyche of the defendant and discern its innermost workings. It is a most difficult assignment. As an appellate court with only the cold, lifeless record to guide us, we naturally defer to the trier of fact who heard the witness' tone of voice, saw their facial expressions and presumably caught the trial's subtleties—all of which may be lost in the written word." *Commonwealth v. Cain*, 349 Pa.Super. 500, 503 A.2d 959, 971 (1986).

Implicit in the jury's verdict in this case is its finding that Barrett, at the time he shot Silvia, was not of such diminished mental capacity as to be unable to appreciate the wrongfulness of his conduct, or to conform his conduct to the requirements of the law. Barrett's guilt for that murder in the second degree finds ample support in the trial record. Barrett's contention that the trial jury misconceived the trial evidence and erred in not accepting the medical opinions proffered by his witnesses is without merit.

## III

### Rule 701—Lay Witness Opinion

Barrett contends that the trial justice erred in precluding certain of his lay witnesses from relating to the trial jury their

---

5. Section 6–2(a) of the Illinois Criminal Code virtually mirrors the Model Penal Code standard that we adopted in *State v. Johnson*, 121 R.I. 254, 399 A.2d 469 (1979). It states: "a person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (720 Ill.Comp.Stat. 5/6–2(a) (1993).

personal opinions about Barrett's mental condition. Those witnesses were Barrett's father, and Ms. Lynn Carvalho and Ms. Dana Dorrity, both friends of Barrett. Barrett's father had been expected to testify that Barrett was "delusional" and "urging [*sic* ] mania" during the years and months leading up to the shooting; Ms. Carvalho, that Barrett was "manic" in the early spring prior to the shooting and Ms. Dorrity, that Barrett was "delusional" only weeks before the shooting.

He faults the trial justice for not permitting his father, Ms. Carvalho, and Ms. Dorrity to tell the jury what they each believed Barrett's mental condition to have been at the time of the shooting. He contends that the trial justice "turned a blind eye to the time honored tenet" that lay opinion regarding a person's mental condition should be admissible. He cites in support of that contention 7 Wigmore, *Evidence in Trials at Common Law,* (Chadbourn rev. ed.1978), and contends that most state and federal courts recognize "that a lay witness's opinion concern-

ing another's sanity is admissible." [6] Thus, he asserts the trial justice erred in precluding his father and his two lady friends from expressing their personal opinions regarding his mental state at the time of the shooting. We disagree.

Barrett additionally asserts that the trial justice erred by improperly sustaining the state prosecutor's objections to certain questions posed during cross-examination by his defense counsel seeking to solicit lay opinions from two prosecution witnesses, Patrolman Kevin Feeney and Lieutenant John Lynch. His rather inartfully crafted questions posed to those two witnesses had been objected to by the state's prosecutor, and the trial justice sustained those objections. We note the particular questions that were posed:

"Did it seem unusual to you that a doctor would be living in a house of these conditions?

"* * *

"There is no rhyme or reason for him jumping from one subject to another, is there?

---

6. Obviously, Barrett is unaware that Rule 704(b) of the Federal Rules of Evidence, unlike our state rule, actually precludes admission of both lay as well as expert witness opinion evidence concerning another's "sanity" in criminal proceedings in which a defendant's sanity is in issue. Federal Rule 704(b) provides that:

"No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone."

That Rule 704(b) has been held to be constitutional in *United States v. Austin,* 981 F.2d 1163 (10th Cir.1992) and, in *United States v. Morales,* 108 F.3d 1031 (9th Cir.1997) was held to apply to lay witnesses as well as to expert witnesses. Federal Rule 704(b) is *not* a part of our state Rule 704. The rationale for its inclusion into the Federal Rule is explained in *United States v. Prickett,* 604 F.Supp. 407, 409 (S.D.Ohio 1985). It is there stated:

"The legislative history of Rule 704 as amended explains the relationship of the new Rule 704(b) to the codification of the

insanity defense in 18 U.S.C. § 20 as follows: The purpose of this amendment is to eliminate the confusing spectacle of competing expert witnesses testifying to directly contradictory conclusions as to the ultimate legal issue to be found by the trier of fact. Under this proposal, expert psychiatric testimony would be limited to presenting and explaining their diagnoses, such as whether the defendant had a severe mental disease or defect and what the characteristics of such a disease or defect, if any, may have been. H.Rep. No. 98–1030, 98th Cong., 2d Sess. 224, 232. This and other relevant portions of the legislative history make it clear that while under Rule 704(b) an expert may testify as to the defendant's severe mental disease or defect and the characteristics of such a condition, he or she is not to offer the jury a conclusion as to whether said condition rendered the defendant 'unable to appreciate the nature and quality or the wrongfulness of his acts.' 18 U.S.C. § 20 (1984). Rather, under Rule 704(b), the latter is an 'ultimate issue' to be determined solely by the jury on the basis of the evidence presented. *See* H.Rep. No. 98–1030, 98th Cong., 2d Sess. at 224–25, 227, and 233.)."

" * * *

"Did it strike you as unusual for a suspect to be sitting there telling you that his parents—describe his parents that way?" [7]

At a trial at which a defendant's diminished capacity is alleged, and when it is asserted that the defendant's diminished capacity prevented formation of the intent required for conviction of first-or second-degree murder, evidence of a defendant's nonconformist or bizarre behavior before or at the time of his committing the charged criminal act can be relevant and helpful to the jury that is called upon to decide the question of a defendant's ability to form the criminal intent necessary to commit the particular crime. *See, e.g.,* Paul H. Robinson, 1 *Criminal Law Defenses,* § 101 (1984 & Moskovitz 2000 Supp.); 2 *Wharton's Criminal Law* § 107 (15th ed. Torcia, 1994). Accordingly, such evidence by lay witnesses about and describing a defendant's nonconforming or bizarre behavior, is often permitted. *See, e.g., Gilmore,* 210 Ill.Dec. 471, 653 N.E.2d at 61. Our Rule 701 permits such testimony. It provides:

"If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

We have interpreted that rule as permitting a lay witness to venture an opinion on a matter that was observed by that witness, but in general, only when the witness is unable to describe the matter to the trial jury precisely as it appeared to the witness at the time the witness observed the occurrence of the particular matter. Where, however, a lay witness is able to describe precisely to a jury the observed facts upon which the witness then is expected to proffer his or her lay opinion formed from those previously detailed facts, we have generally precluded the lay opinion. We held in *State v. Lutye,* 109 R.I. 490, 287 A.2d 634 (1972), that when a lay witness is capable of relating to the jury the witness' particular recollection and description of an event, or, as in this case, the conduct of an individual:

"[N]o expression of opinion will be permitted, if a verbal picture of the testimony has been so adequately portrayed that the jurors, without benefit of the witness' appraisal, are able to draw an intelligent conclusion from the witness' recitation of his observations." *Id.* at 495, 287 A.2d at 637–38.

We have followed that holding, for example, in *State v. Fogarty,* 433 A.2d 972 (R.I.1981), and in *State v. Speaks,* 691 A.2d 547 (R.I.1997). *See also* 1 *McCormick on Evidence,* ch. 3, §§ 11, 12 (5th ed. J.W. Strong 1999). The questions put to Barrett's father and to Barrett's two lady friends called for their opinions about the status of Barrett's mental state at the time and place of the shooting. Those opinions would be neither rationally based upon their perceptions of Barrett on the day of the shooting (because none had seen him on that day), nor would they be helpful to the jury's clear understanding of what they had already been permitted to tell the jury concerning their past observations of Barrett. It "can scarcely be contended that in the ordinary course of events a lay witness is able to determine such inner feelings as might arise" when Barrett was threatened by Silvia, and when Barrett later chased Silvia around the parking lot threatening to shoot Silvia if Silvia did not leave the Mobil station premises. *State v. Ellis,* 619 A.2d 418, 423 (R.I.1993). "This is a question that a lay witness (and probably most expert witnesses) would be totally unqualified to answer." *Id.*

We are also mindful, as we consider Barrett's "blind eye" assertions of error on

---

7. The defense in its brief states that these questions all were posed to Patrolman Feeney. The second and third questions were actually posed to Lieutenant Lynch.

the part of the trial justice in precluding the answers to defense counsel's particular questions posed to Patrolman Feeney and to Lieutenant Lynch, which we noted earlier, that the decision to permit opinion testimony by a lay witness is left to the sound discretion of the trial justice. *State v. Mallett*, 600 A.2d 273, 276 (R.I.1991). It is obvious from the questions that were posed to the two officers that defense counsel was seeking to obtain from them their lay opinions about whether something Barrett did was in their opinion "unusual." Whether something seemed "unusual" to them or made "rhyme or reason" to those particular witnesses, we do not believe would have been of any material assistance to the jury.

■ Any supporting rationales for the admission of lay witness opinion is less available in cases calling for lay opinion on an individual's mental state. *See, e.g., Ellis*, 619 A.2d at 423. In that regard, a person with little or no medical knowledge may lack a general understanding of mental illness, particularly in regard to the intricacies of how certain events affect or exacerbate a mental illness. In many situations, external manifestations of mental illness do not always present themselves. There is clear indication that lay witnesses often have difficulty in testifying in nonconclusory language and have difficulty in distinguishing between "fact" and "opinion" in cases in which a person's mental state is at issue. We conclude that under these circumstances, there is less justification for permitting a lay witness to express an opinion concerning another's sanity or diminished capacity at a time when that other person was not being observed by the lay witness. Such lay opinions could very well invade the fact-finding province of the jury and serve only to inject confusion into their deliberations.[8]

■ On the trial record before us, we are unable to discern any error on the part of the trial justice, nor any abuse of his discretion, in precluding defense counsel from eliciting from Barrett's father and Barrett's two lady friends their lay opinions concerning what they believed to have been Barrett's state of mental condition long before the time Barrett chased, threatened, and shot Silvia, an event that none of them actually observed. Nor do we observe any error or abuse of discretion in the trial justice's refusal to permit Officers Feeney and Lynch from venturing their opinions about whether certain things said to them by Barrett seemed "unusual" to them. The trial jury was as capable as those witnesses to draw its own appropriate conclusions from the descriptions given of Barrett's conduct, actions and words that had been related to them by those witnesses.[9]

Each of the referenced witnesses had full opportunity and was permitted to fully describe the specific facts or events upon which each of their excluded lay opinions would have been based. In the record before us, there is no indication that any witness had been precluded from describ-

8. Federal Rule 704(b), as noted earlier, precludes both lay and expert witness opinion on the issue of a defendant's mental state or condition constituting an element of the crime charged or of a defense thereto. Our Rule 704 does not, however, exclude all such opinions. Their admission is in great part left to the discretion of the trial justice.

9. Lawrence Barrett, the defendant's father, was not permitted to express his lay opinion that his son, in 1990, while in Vermont, "seemed delusional" and that in the spring of 1995 the defendant was "urging [*sic* ] mania."

Dana Dorrity was not permitted to express her lay opinion that in July of 1995, some days before the shooting, she detected during her telephone conversation with Barrett that he "seemed delusional." Ms. Dorrity had been permitted to tell the jury that Barrett, during that telephone conversation, appeared to be in a "sort of enhanced, excited, almost fantasy kind of state."

Lynn Carvalho was precluded from expressing her lay opinion that she was surprised to see Barrett with a gun, some time before the day of the shooting, and that she thought "that he was in the state of having guns which is more manic."

ing or reproducing the subject matter of what would have been the basis of that witness' ultimate opinion concerning the defendant's mental state. On the contrary, the vivid and tragic portrait that each witness drew of Barrett was more than adequate to assist the jury in being able to reach its own conclusion about Barrett's mental state.

We also note from the trial record that the trial justice did permit a number of Barrett's friends and family members to testify and relate to the jury what they had perceived of the defendant's "messy apartment," his periodic spending sprees, his occasional socially inappropriate conduct, his quick and at times rambling speech and irritability, his sometimes belief that his neighbors were against him and out to get him and his purchase of guns to protect himself and his dog. Additionally, we note from the record that the trial jury also learned from some of Barrett's witnesses that Barrett, despite his bipolar disorder, was at the same time able to achieve academic and professional success as a third-year resident in Brown University's psychiatric residency program, was a proficient and talented musician, an artist, a teacher in college and medical school prep courses, and that he could appreciate right from wrong. In particular, we note the testimony of Barrett's friend, James Radio, a psychiatrist and colleague of Barrett's. He testified that while on occasion he had observed Barrett as being in a manic state, he had not witnessed Barrett engaging in "tangential thinking" or being either paranoid or psychotic.

Whether to admit the proffered lay opinions from the above-referenced trial witnesses was a matter left to the sound discretion of the trial justice, and reviewable here under an abuse of discretion standard. *Mallett*, 600 A.2d at 276. We discern from the record no abuse of discretion on the part of the trial justice in excluding the lay opinion evidence from the referenced witnesses, especially when, as here, those witnesses already had been permitted to testify to the facts upon which their intended characterizations of Barrett's mental state had been predicated. *See, e.g., Doyle v. State*, 785 P.2d 317, 322–23 (Okla.Crim.App.1989).

Nevertheless, and despite the parameters noted above and laid down in our established case law, and by Rule 701, Barrett here appears to attempt to manufacture a viable appellate issue by contending that the trial justice precluded his trial counsel from conducting a full cross-examination on matters concerning Barrett's mental state that he believes had been opened up on direct examination by the state's prosecutor. He cites to seven questions that had been posed by the prosecutor to various lay witnesses. He overlooks, however, that at no time did his defense counsel interpose any objection to those questions. True, the prosecutor's questions did inquire of the several witnesses whether they had observed anything "unusual" about Barrett's behavior or demeanor,[10] but had there been timely and proper objection made to those questions, the trial justice certainly would have sustained some or all those objections. Barrett cites to three questions his defense counsel posed to the two police officers,

10. The questions were:
"Did you notice anything unusual about his behavior that evening?
"Did anything strike you as unusual about his speech?
"When you initially introduced yourself to the defendant did you notice anything about his demeanor, or his speech when he spoke back to you?
"Did you observe any kind of bizarre behaviour [*sic*] from him at all?

"Did you notice anything unusual at all about his behavior during the test, or printing, or the photos?
"Did you notice anything unusual about his physical mannerisms as he was walking up the stairs?
"You never noticed anything unusual about his behavior during that period of time?"
This last question was actually that of the prosecutor on cross-examination, not direct examination as maintained by the defense.

Feeney and Lynch,[11] during his counsel's cross-examination of those officers, and which were objected to by the prosecution and sustained by the trial justice. He then contends therefrom his conclusion that the trial justice "let" the prosecutor's questions stand, but "didn't extend the same courtesy to the defense on cross." Basically, Barrett argues that no matter how improper the prosecutor's questions were, because they were not objected to by his defense counsel, that his defense counsel ought to have been allowed to ask similarly flawed questions. Barrett's contention is premised upon his assumption that all the questions were substantively similar. However, as the trial justice determined, the prosecutor's questions arguably were different qualitatively than the ones posed by defense counsel. As the trial justice explained, the prosecutor's questions asked for observations of "speech," "gait," and "facial expressions" that a casual observer could certainly describe. In contrast, defense counsel's proposed questions actually solicited conclusory opinions regarding Barrett's mental state. The defendant's theory advanced here appears to be that one bad question on direct examination automatically entitles him to another on cross-examination. That theory is one that is not yet familiar to our law.

A defendant's right to cross-examine a state witness is protected by article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution. *See Olden v. Kentucky*, 488 U.S. 227, 231, 109 S.Ct. 480, 483, 102 L.Ed.2d 513, 519 (1988); *State v. Toole*, 640 A.2d 965, 976 (R.I.1994). Once a defendant has conducted sufficient cross-examination to satisfy his or her constitutional right of confrontation, the permissible scope and extent of any further cross-examination then rests in the sound discretion of the trial justice. *See Toole*, 640 A.2d at 976; *State v. Morejon*, 603 A.2d 730, 736 (R.I.1992). The cross-examination of a witness is generally limited to matters brought out on direct examination, and the cross-examiner is permitted to make a full inquiry into those matters. Such a "full" inquiry, however, does not embrace any counsel's right to ask improper questions. As we explained in *Toole*, 640 A.2d at 977, "[t]he right to cross-examination does not imply an absolute right to ask any question regardless of how objectionable." In this particular case, simply because defense counsel failed to object to an inappropriate question posed by the prosecutor on direct examination, that failure did not transmogrify that improper question or its line of inquiry into a proper one for purposes of defense counsel's cross-examination. After reviewing the trial record in this case, we discern therefrom that the trial justice extended more than ample, perhaps excessive, latitude to defense counsel during his cross-examination of the trial witnesses about Barrett's mental state. For example, defense counsel was permitted to inquire of Michael Glynn, the gas station employee, who hardly knew Barrett, whether he had noticed anything "unusual" about Barrett on one particular evening; similarly, to inquire of Detective Charles Swenson if it was "unusual" for suspects to initial only one paragraph of a Miranda rights form and to then sign the remaining paragraphs; and, again, to inquire of Patrolman Feeney if it struck him as "unusual" that Barrett addressed him as "Badge 66."

We conclude from the record before us that Barrett's trial counsel had been permitted more than adequate latitude in his cross-examination of the state's witnesses. We fail to observe any Rule 701 transgres-

11. These questions were the same ones referenced supra: "Did it seem unusual to you that a doctor would be living in a house of these conditions?" "There is no rhyme or reason for him jumping from one subject to another, is there?" "Did it strike you as unusual for a suspect to be sitting there telling you that his parents-describe his parents that way?"

sions on the part of the trial justice in his rulings precluding the defendant's attempt to elicit expert opinions from lay witnesses who were clearly not qualified to proffer those opinions.

## IV

### The Judgment of Acquittal Motion

Barrett contends that the trial justice should have granted his motion for a judgment of acquittal and that in failing to do so, he erred.

He contends that the trial evidence was insufficient to enable the trial jury to be able to conclude beyond a reasonable doubt that at the time he shot and killed Silvia, he was capable of forming the "specific mental state or intent" necessary for conviction of either first or second-degree murder. He contends that because of his "diminished capacity," the crime of murder charged in the indictment was reduced "to the lesser included crime of manslaughter."[12] That contention appears flawed in two basic respects. First, it appears to overlook the fact that proof of the commission of "a homicide without additional evidence is presumed to be murder, [but that] presumption ordinarily rises no higher than murder in the second degree." *State v. Mattatall*, 603 A.2d 1098, 1106 (R.I.1992) (quoting *Wharton's Crimi-*

*nal Law*, § 140 at 182, 184–85 (Torcia 14th ed.1979)). To prove commission of second-degree murder by Barrett, the state was required only to prove beyond a reasonable doubt that Barrett, with malice existing for less than of momentary duration, intended to unlawfully kill Silvia. The very fact that he used a gun was sufficient to prove his malice and that "a reasonable inference may be drawn, directly and without speculation, that [Barrett] formed an intent to kill [Silvia]." *Mattatall*, 603 A.2d at 1106. We have also held that "an intent to kill, however brief, * * * can satisfy the necessary element to establish malicious intent," *Id.* at 1106, and that "Premeditation and deliberation are not elements of murder in the second degree." *State v. Grabowski*, 644 A.2d 1282, 1285 (R.I.1994) (quoting *Mattatall*, 603 A.2d at 1106); *see also* Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 7.7(e) at 648 (2d ed. 1986 & 2001 Supp.).[13]

Secondly, in challenging the trial justice's ruling denying his motion for judgment of acquittal, Barrett proceeds to undertake a discussion critical of the reliability and legal sufficiency of the expert opinion offered by the prosecution's witness, Dr. Robert Cserr, who had testified that Barrett, at the time he shot and killed Silvia, was then capable of having formed the intent and malice aforethought necessary for conviction in a

12. Barrett, in his brief, offers in support of his position, *Clark v. State*, 475 So.2d 657 (Ala. Crim.App.1985); *State v. Peters*, 643 So.2d 1222 (La.1994), and *State v. Jackson*, 890 S.W.2d 436 (Tenn.1994). His reliance thereon is misplaced. In *Clark*, the only medical evidence was that Clark, a totally disabled naval veteran, was insane, of "paranoid schizophrenic type" and that his illness was so "cut and dried" that any other psychiatrist would agree with that diagnosis. In this case there was conflicting medical opinion regarding Barrett's diminished capacity. In *Peters*, all of the medical experts in that case had found Peters to be legally insane. In this case, the medical opinions contested that finding. In *Jackson*, even the state's expert admitted that the defendant was mentally ill and that his "insanity defense was supportable" by the trial evidence. *Jackson*, 890 S.W.2d at 441. That, of course, is not what the state's medical expert said in this case.

13. It is interesting here to note that while Barrett in his appeal questions the trial justice's submission of the first and second-degree murder charge to the trial jury, his trial counsel offered not one objection to the trial justice's instruction to the jury regarding those two crimes. The trial record reveals that the trial justice not only instructed the jury with regard to first and second-degree murder, but as well, manslaughter, and with the two gun related charges. In addition, he instructed the jury with regard to Barrett's diminished capacity and insanity defense. He provided the jury and trial counsel with copies of his jury instructions, and with a copy of the jury special verdict questionnaire required to comply with Super.R.Crim.P. 31(e).

murder trial. Barrett contends that the trial justice should have accepted and relied instead upon the medical opinions proffered by his medical experts, Drs. Paolino and Gutheil, whose opinions disagreed with Dr. Cserr's opinion. Consequently, Barrett, in his brief, asserts that the trial justice committed reversible error in not granting his motion for judgment of acquittal on the murder charge.

Barrett appears to contend that the trial justice, when passing upon the motion for judgment of acquittal on the murder charge, erroneously evaluated the state's evidence to be sufficient to permit the trial jury to conclude beyond a reasonable doubt that he was capable of forming the specific malicious intent necessary to commit the crime of murder. It is, of course, both elementary, as well as long established that, when passing upon a defendant's motion for judgment of acquittal, the trial justice is not permitted to weigh or to evaluate the trial evidence, nor is he or she permitted to pass upon the credibility of the trial witnesses. *State v. Smith,* 662 A.2d 1171, 1176–77 (R.I.1995). The trial justice in this case was required only to view that trial evidence that the state claimed was capable of supporting Barrett's guilt beyond a reasonable doubt, in a light most favorable to the state, and he was required to draw from that trial evidence all reasonable inferences favorable to, and consistent with Barrett's guilt. *State v. Harrington,* 689 A.2d 399, 402 (R.I.1997). If, in this case, the trial justice, after so viewing the trial evidence and the reasonable inferences drawn therefrom, had determined that such could not have permitted the trial jury to conclude Barrett's guilt beyond a reasonable doubt on the murder charge, he would have been required to grant Barrett's motion as it pertained to the charge of murder. On the other hand, when, as here, the trial justice determined that the trial evidence, which included Dr. Cserr's testimony and opinion, when viewed in the light most favorable to the state, would enable the jury to reject Barrett's diminished capacity defense and to find Barrett guilty beyond a reasonable doubt, he then was obligated to deny Barrett's motion. *State v. Mastracchio,* 612 A.2d 698, 706 (R.I.1992). On the basis of the testimony that had been given by Glynn, Richardson, Dinsmore and Dr. Cserr, the trial jury certainly could find beyond any reasonable doubt that Barrett was "pissed off" at Glynn— that he went to the Mobil station where Glynn was employed to hassle Glynn—that when Silvia later confronted him, Barrett got out of his car, as Richardson said, to "escalate" the argument—that Barrett, while angered by Silvia, instead of driving away, elected to chase down Silvia—to threaten to kill Silvia—and finally to shoot him three times at point blank range. Doctor Cserr testified that Barrett knew what he was doing and appreciated that it was unlawful. The sum of that evidence, when all viewed in a light most favorable to the state and in favor of Barrett's guilt, required the denial of Barrett's motion for judgment of acquittal. Barrett's claim of error, we conclude, is without merit.

## V

### The New Trial Motion

Barrett's final appellate contention of trial error is that he believes that the trial justice erred in denying his motion for a new trial. He argues that the trial justice overlooked or misconceived material trial evidence concerning the nature and extent of his insanity and diminished capacity. He has not contended in his appeal that the trial justice overlooked or misconceived material evidence about his self defense claim. Therefore, we limit our discussion only to his contention that the trial justice erred in regard to his evaluation of the trial evidence concerning Barrett's insanity and diminished capacity.

When considering a defendant's motion for a new trial, pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure, a trial justice is re-

quired to review all the trial evidence and to exercise his own independent judgment upon that evidence to determine whether it was sufficient to have enabled the jury to conclude the guilt of the defendant by proof beyond a reasonable doubt. *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994); *Mattatall,* 603 A.2d at 1108. In exercising his or her independent judgment, the trial justice must pass upon the weight and the credibility of each of the trial witnesses, and in that regard is permitted to accept or reject the testimony offered by those trial witnesses. 603 A.2d at 1108. When the trial justice has articulated a sufficient rationale for his or her decision to deny a defendant's motion for a new trial, that decision will be given great weight. *Id.* This Court will not undertake to second-guess a trial justice's independent evaluation of the trial evidence unless we are able to discern from the record that in doing so, he or she has overlooked or misconceived material evidence relating to a critical trial issue, or if the justice was otherwise clearly wrong. *See Banach,* 648 A.2d at 1367; *State v. Barnes,* 122 R.I. 451, 458, 409 A.2d 988, 992 (1979). Even were we to conclude that the trial evidence and the reasonable inferences drawn therefrom were so evenly balanced, or were such that reasonable minds could have arrived at a different conclusion with respect to that evidence, we would still not disturb the trial justice's decision denying the motion for a new trial. *Mattatall,* 603 A.2d at 1108; *Connors v. Gasbarro,* 448 A.2d 756, 759 (R.I.1982). Furthermore, a trial justice, in articulating the rationale for his or her decision to deny a motion for a new trial, need not specifically refer to each speck of trial evidence that might support his or her decision, but need only relate to that evidence, which is sufficient to allow this Court to determine whether the trial justice has undertaken to comply with the applicable standards for his or her decision. *See Banach,* 648 A.2d at 1367; *Barnes,* 122 R.I. at 458, 409 A.2d at 992.

In this appeal, Barrett contends that the trial justice overlooked or misconceived material evidence concerning his alleged insanity and diminished capacity. He points out that the trial justice recognized only that he suffered from "some mental health problem" and passed over what he contends was other voluminous evidence that established far beyond a fair preponderance of all of the trial evidence that he was legally insane at the time that he shot and killed Silvia. In doing so, Barrett chooses to conveniently ignore the undeniable fact that twelve jurors and later, a learned and experienced trial justice, all had reviewed, considered and rejected that same evidentiary contention.

We have carefully reviewed the trial justice's decision in which he denied Barrett's new trial motion. We discern therein sufficient reference to the material trial evidence and sufficient explanation for the reasons given by him for denying the motion. We thus are able to conclude that he adequately reviewed the trial jury's findings, and the trial evidence that the jury relied on to make its findings. We are also satisfied that he properly exercised his own independent judgment upon the weight and credibility of the trial evidence in determining whether that evidence was sufficient to satisfy the state's burden to have proven beyond a reasonable doubt that at the time Barrett shot and killed Silvia, he both appreciated the wrongfulness of what he was doing, realized that he could be held responsible for what he was doing, and that he could have, but did not then conform his conduct to the requirements of the law. In *State v. Johnson,* we said the test for insanity is:

"A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible." *Johnson,* 121 R.I. at 267, 399 A.2d at 476.

Under the rule we adopted in *Johnson,* the state in this case was required to prove beyond a reasonable doubt that Barrett was capable of forming the malicious intent, however brief, to unlawfully kill Silvia during his somewhat deliberate but yet unfortunate confrontation with Silvia at the Mobil station in East Providence. In addition, the state, and to that same degree of proof, was required to prove that the shooting of Silvia by Barrett was done with malice, arising from either Barrett's express intent to kill Silvia or to inflict great bodily harm on him from wanton recklessness. *State v. Iovino,* 524 A.2d 556 (R.I.1987). Barrett by alleging his diminished capacity "concede[d] his responsibility for the act but claims that, in light of his abnormal mental condition, he is less culpable." *State v. Correra,* 430 A.2d 1251, 1253 (R.I.1981).

While Barrett had no burden of proof to meet and carry, he did, because of his assertion of an insanity or diminished capacity defense, assume the burden of presenting sufficient evidence of his diminished capacity, and to persuade the trial jury that it was of sufficient degree to have prevented him from forming the required intent and malice essential for conviction on the murder charge. *See, e.g., State v. Correia,* 600 A.2d 279, 287 (R.I.1991); *State v. Smith,* 512 A.2d 818, 823 (R.I. 1986); *State v. Capalbo,* 433 A.2d 242, 245 (R.I.1981). This, of course, did not relieve the state of its initial and continuing trial burden to prove beyond a reasonable doubt Barrett's ability to form the necessary intent required for conviction of the crime of murder.

In *Johnson,* 121 R.I. at 266, 399 A.2d at 476, we determined that the determination of whether a particular defendant was insane, or of such diminished capacity to commit the particular criminal act, must be left to the jury. "Without question the essential dilemma in formulating any standard of criminal responsibility is encouraging a maximum informational input from the expert witnesses while preserving to the jury its role as trier of fact and ultimate decision maker." *Id.* We concluded in *Johnson* that "[b]ecause impairment is a matter of degree, the precise degree demanded is necessarily governed by the community sense of justice as represented by the trier of fact." *Johnson,* 121 R.I. at 268, 399 A.2d at 477.

In this case, the trial justice recognized and acknowledged that Barrett suffered from "bipolar disorder" and not just from "some" mental illness. Although he did not recite, in his decision denying Barrett's motion, any long exhortation about Barrett's mental state, he nonetheless succinctly and sufficiently considered both the extensive and material expert testimony, as well as the other trial evidence, that had been introduced during the trial concerning Barrett's alleged diminished capacity at the time of the fatal shooting. While Barrett's experts had concluded that Barrett was of diminished capacity, the prosecution's expert concluded that he was not sufficiently impaired. Accordingly, the issue of Barrett's diminished capacity was one of fact that the jury, in the course of its deliberations, was free to accept or reject, and which the trial justice, when later passing upon the defendant's motion for a new trial, was called upon to independently review. He did, and in the course of that review, he opted to accept the opinion of Dr. Cserr, who had testified that Barrett was not of such diminished capacity as contended by the defense experts. That was the trial justice's choice to make. He noted:

"For example, just before going to the gas station that evening the defendant and his friend went to a restaurant to get something to eat, and the defendant was careful and thoughtful enough to bring any firearms into the restaurant and not to leave them in the car, which he said would have been an unsafe and unwise place to leave them. Immediately after the shooting the defendant made certain that the marijuana which he had in his pocket would be discarded before

the police arrived. That conduct easily bespeaks an individual who can appreciate the wrongfulness of his conduct. Further, the care with which he unloaded the revolver and the particularized efforts he made to show Mr. Glynn, the store clerk, that the gun was now safe also reflects the awareness of the defendant's circumstances and his clear thinking."

We are satisfied from our review of the trial record and trial exhibits that the trial justice in this case diligently exercised his independent judgment on the totality of the trial evidence and on the jury's findings and verdict. He concluded therefrom that the trial evidence:

"supports the conclusion that the defendant shot Mr. Silvia out of anger and not because he was suffering from an abnormal mental condition which rendered him incapable of forming the specific intent to kill Mr. Silvia. The record is replete with instances of the defendant reacting in an untoward fashion when he is angered * * *."

We conclude that he did not err in determining that the state had met its burden of proving by evidence and proof beyond a reasonable doubt, not only Barrett's guilt for murder in the second degree of Joseph Silvia, but also for the two charges of carrying firearms without a license.[14] Barrett has failed to sustain

his burden of persuading us that in his consideration of the new trial motion, the trial justice overlooked or misconceived material evidence on a controlling issue, or was otherwise clearly wrong. *State v. Jefferson,* 116 R.I. 124, 130, 353 A.2d 190, 194 (1976). The mere fact that Barrett now disagrees with the jury's verdicts and with the trial justice's acceptance and approval of those verdicts, does not serve to transform what he wishes into reality.

## VI

### Conclusion

For the reasons herein above set out, the defendant's appeal is denied and his convictions are affirmed. The papers in this case are remanded to the Superior Court.

Chief Justice WILLIAMS, did not participate.

---

14. As to the two unlicensed gun possession charges, Barrett was certainly aware that the law required him to obtain licenses to possess and carry the two handguns that he had in his vehicle. He told Dinsmore that he did in fact have the required licenses.