IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2003

## STATE OF TENNESSEE v. GLENN C. SUMMERS

**Appeal from the Criminal Court for Sullivan County**
**No. S44,706    Phyllis H. Miller, Judge**

**No. E2002-01996-CCA-R3-CD**
**October 27, 2003**

The defendant, Glenn C. Summers, was convicted of first degree murder and sentenced to life imprisonment. In this appeal, the defendant presents two issues for review: (1) that he established the affirmative defense of insanity and (2) that the trial court erred by providing an irrelevant definition of "intentional" in its jury instructions. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA McGEE OGLE, JJ., joined.

Stephen M. Wallace, District Public Defender (at trial), and Steve McEwen, Mountain City, Tennessee (on appeal), for the appellant, Glenn C. Summers.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and J. Lewis Combs, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 20, 2000, the defendant, while in a corridor outside the victim's apartment in Bristol, stabbed to death the victim, Carter Ball. The victim suffered forty-nine stab wounds and his tongue was cut out. In the days before the murder, the victim had complained that the defendant, who lived in the apartment next door, was noisy at night. Pursuant to the complaint, the landlord, Shelby Hopkins, asked the defendant to be quieter and the defendant apologized to her. During their conversation, Ms. Hopkins noticed that the defendant's apartment, usually very neat, was in a state of disarray.

On the following morning, the victim again complained about the noise. As Ms. Hopkins went to the defendant's apartment, she met him in the hall. According to Ms. Hopkins, the defendant was repeating to himself, "Where's he at, where's he at." When asked what was wrong, the defendant looked out the window and asked, "Is them old big carp still out there?" Ms. Hopkins recalled that

the defendant "looked at the door [to the victim's] apartment real strange." She described the defendant and victim as good friends, not having expressed any animosity toward one another until a few days before the stabbing.

On the evening of the offense, Ms. Hopkins heard the sounds of a struggle coming from the common hallway outside of the apartments. After hurriedly putting on her clothes, she found the victim lying on his back in the doorway of his apartment. The defendant was seated on top of the victim. When Ms. Hopkins directed the defendant to "get off," the defendant did not move. At that point, Ms. Hopkins saw "the knife and . . . the puddle of blood." Ms. Hopkins informed the defendant that she intended to call the police and he responded, "Call them, call them." The defendant was still seated on top of the victim when the police arrived approximately five minutes later.

Officer Danny Farmer of the Bristol Police Department, who responded to Ms. Hopkins' call, ordered the defendant to stand. A knife was protruding from the right side of the victim's neck. The defendant, who was covered in blood, remarked, "The one I killed was Carter Ball the draft dodger." Claiming that he was a general, the defendant then apologized to the officer for causing him to come out at such a late hour and asked if the officer "was going to have a good Christmas." The defendant asked about an NFL football game and requested permission to look at Officer Farmer's duty weapon. He also told the officer that his shoes were not well shined. At one point, the defendant claimed that the victim had shot at him but could not, however, provide Officer Farmer with the location of the gun. Just before being taken to the jail, the defendant began to sing, "Everybody loves somebody sometimes . . . ." Officer Farmer stated that he did not finish the song but began to sing, "Do-da, do-da, do-da," before falling silent.

Detective Matt Austin questioned the defendant on the evening of the murder. The defendant claimed that he was a general in the U.S. Army and explained that he had killed the victim because he was a draft dodger. After obtaining a waiver of rights, the detective asked the defendant if he preferred to be called Mr. Summers or General Summers. The defendant laughed and said, "Well, you know, I'm not a General, you can call me Glenn." According to Detective Austin, the defendant eventually admitted that he did not kill the victim because he was a draft dodger. The defendant contended that the victim had been "running his mouth, telling things that aren't true." He claimed that the victim had been making noise at night which kept the other tenants awake. The defendant informed the detective that after seeing the victim in the hallway holding a bundle of sticks, he returned to his apartment and got a knife. The defendant stated that when he confronted the victim, the victim swung the bundle of sticks and in response, he stabbed the victim in the ribs while throwing him to the floor. The defendant explained that he continued to inflict wounds because the victim attempted to take his knife away. When asked why he had cut the victim's tongue out, the defendant responded that he did not realize that he had done so but "wished he would have because he was mad at him."

Dr. Gretal Harlan, a forensic pathologist, performed the autopsy. She testified that the cause of death was multiple stab wounds. She determined that the victim suffered a total of forty-nine stab

wounds. There were twenty-two cuts to the face and tongue, two scrapes to the face, seven slice wounds to the neck, nine superficial wounds to the left belly and left chest, and eight defensive wounds to both arms and hands. It was Dr. Harlan's opinion that the deepest wound, a stab wound to the groin, was sufficient alone to have caused death within twenty minutes. She indicated that the victim was in a standing position when this wound was inflicted. Further, the nature of the wounds established that the murder weapon was dull and that the victim's hands were open throughout the attack. Dr. Harlan classified the victim's wounds as "overkill." She estimated that the stabbing took between eight and thirty minutes.

Dr. Charlton Stanley, a psychologist, testified for the defense. He reviewed the defendant's medical records, interviewed the defendant, and spoke with the defendant's friends. Dr. Stanley explained that he conducted only one test, the Rorshcach Inkblot Test, in evaluating the defendant's mental health because the defendant was too distractable to perform any more involved testing procedures. Dr. Stanley discovered that the defendant had been hospitalized several times between 1990 and 2000. Medical records established that in 1990, the defendant had showed signs of antisocial personality disorder, paranoia, and delusional disorder. After an emergency commitment in 1995, the defendant was diagnosed with bipolar disorder, which Dr. Stanley described as a "real serious" mental illness. During a 1997 hospitalization, the defendant reported auditory hallucinations and was diagnosed with bipolar disorder, schizoaffective disorder, and alcohol dependence. Dr. Stanley described schizoaffective disorder as a form of schizophrenia. In a subsequent hospitalization, the defendant was diagnosed with schizoaffective disorder with psychotic features. The defendant was hospitalized in July of 1999 after attacking a police dispatcher in a store. At that time, the defendant suffered from delusional ideation with paranoid symptoms and dementia. In April of 2000, the defendant was diagnosed with paranoid psychosis disorder.

Dr. Stanley testified that he believed the defendant to be psychotic. It was his opinion that the defendant suffered from paranoid schizophrenia. The doctor stated that the defendant's behavior in the days before the murder indicated that he was decompensating into mental illness and was delusional at the time of the murder, believing that the victim had been hired by his family to murder him and steal his artwork. During interviews, the defendant claimed that his artwork was priceless because he had studied painting with Michelangelo. It was Dr. Stanley's opinion that the defendant knew right from wrong but, because of paranoid delusions associated with his mental illness, was unable to appreciate that killing the victim was wrong. He stated that the defendant earnestly believed that he was acting in self-defense when the victim lunged at him with a bundle of sticks.

During cross-examination, Dr. Stanley acknowledged that the defendant appeared logical during his interview with Detective Austin but explained that the defendant had a "flat affect," indicating schizophrenia. Dr. Stanley described a "flat affect" as expressing no emotion at all. He also admitted that the forensic evidence established that the victim had not attacked the defendant in the manner that the defendant had alleged. Dr. Stanley agreed that it was possible for someone who is mentally ill to malinger and that the defendant had an incentive to make his mental illness appear worse than it really was. He conceded that the defendant was an alcoholic and that he abused marijuana.

Dr. James Turnbull, a psychiatrist and Director of Medical Affairs at Frontier Health, which operates a number of mental health facilities, testified as a rebuttal witness for the state. He stated that he had evaluated the defendant at the request of the trial court to determine the defendant's competence to stand trial and to ascertain his mental state at the time of the murder. Dr. Turnbull contended that the defendant had performed very well on an intelligence test, which indicates that he was not suffering from dementia. He further stated that the defendant cooperated fully with the evaluation and was aware of the nature of the criminal charge and the possible punishment. According to Dr. Turnbull, the defendant was able to relate his mental health history and admitted that some of his hospitalizations had been the result of alcohol abuse. He described the defendant as "alert, responsive, [and having] displayed a full range of affect in the interview," claiming that he killed the victim in self-defense. It was Dr. Turnbull's opinion that although the defendant was "suffering from a mental disease he was still able to appreciate the nature and wrongfulness of the acts constituting the offense."

I

The defendant first asserts that he met his burden to establish the affirmative defense of insanity by clear and convincing evidence. On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilty removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

At the time of the shootings, first degree murder was defined as follows:

(a) First degree murder is:
(1) A premeditated and intentional killing of another;
(2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy; or
(3) A killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

Tenn. Code Ann. § 39-13-202(a) (Supp. 2000).

Here, the defense concedes that the defendant stabbed the victim to death but argues that the proof at trial established that because of his mental illness, he was unable to appreciate the wrongfulness of his conduct and must, therefore, be declared not guilty by reason of insanity. See Tenn. Code Ann. § 39-11-501(a). Tennessee Code Annotated section 39-11-501(a) provides in pertinent part as follows:

> It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Tenn. Code Ann. § 39-11-501(a). The statute places the burden on the defendant to establish insanity by clear and convincing evidence; the state is not required to prove sanity. See State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). "Clear and convincing evidence" is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Id. Although a higher standard than "preponderance of the evidence," this standard is less than "beyond a reasonable doubt." O'Daniel v. Messier, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

Recently, in State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (Flake I), our supreme court held that "appellate courts in Tennessee should apply the reasonableness standard when reviewing a jury's rejection of the insanity defense." Our high court ruled that "appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." Id. "A reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the jury appropriately rejected the insanity defense." Id. Later, in State v. Flake, __ S.W.3d __, No. W2001-00568-SC-R11-CD (Aug. 5, 2003) (Flake II), where the evidence of Flake's insanity was even more compelling than in the initial proceeding, our supreme court concluded that the jury could have properly found that the defendant had failed to establish the insanity defense by clear and convincing evidence.

In this instance, Dr. Stanley testified extensively regarding the defendant's history of mental illness. It was his opinion that the defendant was a paranoid schizophrenic operating under the insane delusion that the victim was trying to kill him at the time of the murder. Dr. Stanley explained that while the defendant knew right from wrong, he was unable to appreciate that it was wrong to kill the victim because of his delusion. He further believed that Ms. Hopkins' testimony about the defendant's behavior in the days leading up to the shooting was evidence of the defendant's decompensation into mental illness. On the other hand, the state provided evidence through the testimony of Detective Austin that the defendant, while behaving somewhat strangely immediately after the shooting, provided logical answers during the interview. In addition, the defendant claimed

to the officer that he was not insane, acknowledging that the stabbing was not in self-defense but in relation to the victim's false claims. Dr. Turnbull testified that the defendant was not insane, having performed well on an intelligence test, indicating that he was not suffering from dementia. A jury might have inferred that the victim's wounds, described as "overkill," militated against the defendant's contention that he acted in self-defense.

Our supreme court has held that when determining the issue of insanity, the jury may consider both lay and expert testimony and may discount expert testimony which it finds to be in conflict with the facts of the case. State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994). The jury is not required to resolve conflicts between expert testimony and testimony as to the facts of the case in favor of expert testimony and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976). In determining the defendant's mental status at the time of the crime, the jury may look to the evidence of the defendant's actions and words at or near the time of the offense. Sparks, 891 S.W.2d at 616; Humphreys v. State, 531 S.W.2d 127, 132 (Tenn. Crim. App. 1975). Here there was conflicting testimony about the defendant's sanity. Under these circumstances, it is our view that the defendant has failed to establish that no reasonable trier of fact would have failed to find that his insanity at the time of the offense was established by clear and convincing proof. See Flake, 88 S.W.3d at 554.

II

As his final issue, the defendant contends that the trial court erred by providing an irrelevant definition of "intentional" in its instruction on first degree murder. He claims that by providing the nature-of-conduct definition of intentional in addition to the result-of-conduct definition, the trial court improperly lessened the state's burden of proof.

Trial courts have a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt. State v. Walker, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999).

In this instance, the trial court provided the following instructions regarding first degree murder:

For you to find the defendant guilty of this offense the State must have proved beyond a reasonable doubt the existence of the following essential elements:
(1) that the defendant unlawfully killed the alleged victim, Carter Ball, and
(2) that the defendant acted intentionally and
(3) that the killing was premeditated.

Intentionally means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. A premeditated act is one done after the exercise of reflection and judgment.

Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect.

Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion but the accused commits the act after the passion has subsided.

In State v. Page, 81 S.W.3d 781 (Tenn. Crim. App. 2002), a panel of this court held that because second degree murder is a result-of-conduct offense, the trial court erred by including the nature-of-conduct and nature-of-circumstances[1] definitions of knowingly. Further, the panel determined that the error could not be classified as harmless beyond a reasonable doubt because the defendant's mental state was a contested issue at trial. Id. at 789-90.

As indicated, the defendant in this case was convicted of first degree premeditated murder, which requires a specific finding that the defendant acted intentionally. In State v. Antoinette Hill, No. E2001-02524-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Dec. 13, 2002), the defendant, who was convicted of first degree murder, complained that the trial court had erred by providing the nature-of-conduct definition of intentionally. This court determined that the trial court should not have recited the nature-of-conduct definition of intentional because first degree premeditated murder, like second degree murder, is a result-of-conduct offense. The panel ruled, however, that because the defendant had been convicted of first degree murder, which requires a finding that the defendant acted with premeditation, the error could be classified as harmless beyond a reasonable doubt. Id., slip op. at 6.

By its verdict, the jury in this instance concluded that the defendant acted with premeditation, that is to say that he displayed a previously formed design or intent to kill. See State v. West, 844

---

[1] "[A] person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b).

S.W.2d 144, 147 (Tenn. 1992); <u>Antoinette Hill</u>, slip op. at 6.  Implicit in a finding of premeditation is that it was the defendant's desire to cause the result of his conduct, i.e., the death of the victim. Because the jury determined that the defendant acted with the design to kill, it is our view that the inclusion of the nature-of-conduct definition of intentional would be harmless beyond a reasonable doubt.  <u>See</u> <u>Antoinette Hill</u>, slip op. at 6.

    Accordingly, the judgment of the trial court is affirmed.

_____<br>
GARY R. WADE, PRESIDING JUDGE